UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
MICHAEL JOHNSON,

     *Plaintiff*,

-against-

THE CITY OF NEW YORK, DANIEL A.
NIGRO, MICHAEL GALA, MICHAEL
CURNEEN, JAKE LAMONDA, AND JOHN JOE
OR JANE DOE,

     *Defendants*.
--------------------------------X

**MEMORANDUM & ORDER**

16-CV-6426(KAM)(VMS)

**MATSUMOTO, United States District Judge:**

     In an amended complaint, ("Compl." or the "complaint"
ECF No. 23), plaintiff Michael Johnson ("plaintiff") alleges
violations of his constitutional and civil rights, as well as
contempt of a federal court order, by defendants City of New
York (the "City"), Commissioner Daniel A. Nigro, ("Nigro")
Michael Gala ("Gala"), Michael Curneen ("Curneen") (the "City
Defendants"), and James Lemonda[1] ("Lemonda," and together with
the City Defendants, "defendants") in connection with alleged
workplace retaliation and alleged involvement in the disclosure
of protected personal information, which resulted in derogatory
media articles about plaintiff.

---

[1]    Lemonda is named as "Jake LaMonda" in plaintiff's amended complaint,
but as set forth in Lemonda's memorandum of law in support of his motion to
dismiss, his legal name is James Lemonda. (Lemonda Mem. (as defined below)
at 2 n.1.)

Presently before the court are two motions, one by the City Defendants and one by Lemonda, to dismiss certain of the causes of action asserted in the complaint under Federal Rule of Civil Procedure ("Rule") 12(b)(6) for failure to state a claim upon which relief can be granted. The City Defendants' motion seeks dismissal of Nigro from the instant action, and of all but two of plaintiff's claims against the City Defendants. Specifically, the City Defendants do not seek dismissal of plaintiff's claim alleging retaliation in violation Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), as it relates to conduct occurring on or after April 9, 2015. Nor do the City Defendants seek dismissal of plaintiff's claims alleging retaliation in violation of the New York State and New York City Human Rights Laws. Lemonda seeks dismissal of all of plaintiff's claims against him.

In support of their motion to dismiss, the City Defendants have submitted, among other documents, a memorandum of law, ("City Mem.," ECF No. 48-3), and a reply memorandum. ("City Repl.," ECF No. 48-5.) Lemonda has also submitted, among other documents, a memorandum of law, ("Lemonda Mem.," ECF No. 47-5), and a reply memorandum. (ECF No. 47-6.) Plaintiff opposes both motions and has submitted a memorandum in opposition. ("Opp.," ECF No. 50.)

For the reasons set forth below, both the City
Defendants' and Lemonda's motions are granted in part and denied
in part.

**BACKGROUND**

**I.    Background**

**A.    Parties**

The court assumes as true the following factual
allegations from the complaint. *See Pension Ben. Guar. Corp. ex
rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan
Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 717 (2d Cir. 2013)
("[W]hen there are well-pleaded factual allegations, a court
should assume their veracity and then determine whether they
plausibly give rise to an entitlement to relief." (citation
omitted)).  As alleged in plaintiff's complaint, plaintiff is of
"Black-American heritage" and, prior to 2014, worked for 15
years as an emergency medical technician ("EMT") with the Fire
Department of the City of New York ("FDNY").  (Compl. ¶ 2.)  In
2014, pursuant to a court order entered by the Honorable
Nicholas G. Garaufis in the case captioned *United States, et. al
v. City of New York*, No. 07-CV-2067(NGG) (E.D.N.Y.) (the "Class
Action"), FDNY appointed plaintiff as a "priority hire"
firefighter.  (*Id.* ¶¶ 2, 19.)

Nigro, Gala, Curneen and Lemonda are all City
employees and are affiliated with the FDNY.  Specifically, Nigro

3

is the Commissioner of the FDNY, and, according to the complaint, "is sued solely in his official capacity." (*Id.* ¶ 12.) Gala is a senior supervisor within the FDNY. (*Id.* ¶ 13.) In 2012, he received a promotion from chief of uniformed personnel, which position he held "at all times relevant to th[e] [c]omplaint," to deputy assistant borough commander for Manhattan. (*Id.*) Curneen also holds a supervisory position within the FDNY, and on January 2, 2016, he "was promoted from Captain of Engine Company 257 to Battalion Chief." (*Id.* ¶ 14.) Lemonda also holds the rank of Batallion Chief within the FDNY, although on September 1, 2009, he was "granted leave with full pay and benefits" to work at the Uniformed Fire Officers Association ("UFOA").[2] (*Id.* at ¶ 15.)

## B.  The Class Action

In the 1940s, Black firefighters within the FDNY formed the Vulcan Society, Inc. (the "Vulcan Society"), a fraternal organization that, in relevant part, has advocated for racial diversity within the FDNY. (*Id.* ¶ 24.) In 2002, the Vulcan Society filed a discrimination charge against the FDNY with the United States Equal Employment Opportunity Commission

---

[2]     The complaint does not elaborate as to what the UFOA is, but according to Lemonda's memorandum of law, "the UFOA is a public sector employee organization recognized by the City of New York to represent uniformed employees of the [FDNY] above the rank of firefighter. Lemonda is the President of the UFOA. Plaintiff is a New York City firefighter, whose civil service title is represented by a different labor union, the New York City Uniformed Firefighters Association." (Lemonda Mem. at 1-2.)

("EEOC") alleging that the City's civil service exam for firefighters had an adverse impact on minority candidates in violation of Title VII. (*Id.* ¶ 25.) In 2005, three individual Black firefighter candidates filed a separate EEOC charge, which made substantially similar assertions regarding the City's civil service exam for firefighters. (*Id.*) The EEOC determined that there was probable cause to believe that the civil service exam violated Title VII and, in May 2007, the United States Department of Justice filed the Class Action, which alleged that City's civil service exams for firefighters discriminated against minority candidates. (*Id.* ¶ 26.) The Vulcan Society and the aforementioned three individual Black firefighter candidates intervened as co-plaintiffs in September 2007. (*Id.* ¶ 27.)

In July 2009, the court granted summary judgment motions by United States, the Vulcan Society, and the three individual plaintiffs in the Class Action. (*Id.* ¶ 28.) In relevant part, the court concluded that plaintiffs had "established disparate impact liability" arising from the City's use of certain firefighter examinations, and wrote that it would proceed to consider an "appropriate remedy," and to address other pending aspects of the Class Action. *United States v. City of New York*, 637 F. Supp. 2d 77, 131-32 (E.D.N.Y. 2009).

In January 2010, the court presiding over the Class Action entered an order directing the City to develop a new, non-discriminatory firefighter exam and to provide monetary and other relief to firefighter candidates who had been denied appointment as firefighters, or had their appointments delayed, as a result of the discriminatory exams.  (Compl. ¶ 29.) Additionally, in December 2011, the court entered an order[3] providing, in relevant part, that

> [t]he City of New York shall not retaliate against or in any way adversely affect the terms or conditions of employment of any person because he or she has complained of discrimination against blacks or Hispanics on the basis of their race or national origin in the selection and hiring of entry-level firefighters, or has participated in the investigation or litigation of any claim or allegation of such discrimination, or has sought or obtained relief from the court in this case.

*United States v. City of New York*, No. 07-CV-2067(NGG)(RLM), 2011 WL 6131136, at *4 (E.D.N.Y. Dec. 8, 2011), *aff'd as modified*, 717 F.3d 72 (2d Cir. 2013).[4]

---

[3]     Although not mentioned in the complaint, this order in the Class Action was subsequently modified, though the modified order retained an identical anti-retaliation provision.  (*See* Modified Remedial Order, No. 07-CV-2067(NGG)(RLM), ECF No. 1143, ¶ 17.)

[4]     The court takes judicial notice of the relevant filings from the Class Action to establish "the fact of such litigation and related filings." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *see also Bentley v. Dennison*, 852 F. Supp. 2d 379, 382 n.5 (S.D.N.Y. 2012) ("Judicial notice of public records is appropriate . . . because the facts noticed are not subject to reasonable dispute and are capable of being verified by sources whose accuracy cannot be reasonably questioned."), *aff'd sub nom. Betances v. Fischer*, 519 F. App'x 39 (2d Cir. 2013).

The complaint in this case asserts that the Class
Action was met with "[s]trong and vocal hostility . . . within
large segments of the FDNY workforce, including Commissioner
Nigro's executive staff."  (Compl. ¶ 31.)  In 2007 and 2008,
defendant Gala allegedly wrote "a series of letters" to the
editor of the *Chief-Leader*, a publication that "focuses on labor
and employment issues of concern to City employees."  (*Id.* ¶
32.)  These letters are not presently before the court.  The
complaint, however, asserts that in the letters, Gala wrote that
he was "'tired' of black and female FDNY firefighters claiming
that the FDNY's hiring practices were unfair," and "criticized
the Vulcan Society's approach to diversifying the FDNY as
'shallow.'"  (*Id.* ¶ 32.)

Additionally, the complaint asserts that in 2010, non-
party Paul Mannix, an FDNY Deputy Chief, formed "'Merit
Matters,' an informal organization of hundreds of FDNY
firefighters [with] the purpose of opposing integration of the
FDNY."  (*Id.* ¶ 33.)  According to the complaint, "Merit Matters
posted written materials sharply critical of the Vulcan Society,
the[] [Class Action], the District Court Judge [presiding over
the Class Action], and the Court Monitor on union bulletin
boards throughout the FDNY['s] firehouses."  (*Id.*)

The complaint further alleges that Merit Matters
published "at least a dozen press releases that were distributed

to firehouses over the FDNY's fax system, and placed on union bulletin boards and in other locations within numerous FDNY firehouses" between August 2011 and September 2012. (*Id.* ¶ 34.) These press releases allegedly claimed that the judge overseeing the Class Action was "biased and guilty of nepotism," that the Vulcan Society "helped minority firefighter candidates get an unfair advantage on the City firefighter entrance exam," that the Vulcan Society's "efforts to reform . . . hiring practices put the lives of current firefighters at risk," and that "many of the Court-ordered injunctive remedies discriminated against whites." (*Id.*) The press releases (which the complaint also refers to as "bulletins") also allegedly "pointedly discouraged Black and Hispanic firefighters from filing claims for compensatory relief, warning that such claims would cause resentment within the FDNY rank-and-file." (*Id.*)

The complaint also notes that the court presiding over the Class Action held a fairness hearing in October 2012 regarding a proposed compensatory relief order, and asserts that "several hundred FDNY firefighters and senior fire officers voiced criticism [of] the District Court's liability ruling against the City" in connection with the hearing. (*Id.* ¶ 35.) According to the complaint, "[m]any" of these firefighters and officials "expressed outrage that the Court was interfering with the culture and traditions of the FDNY, claim[ed] that the

proposed compensatory relief discriminated against whites, and predict[ed] that awarding compensatory relief to Black and Hispanic victims of discrimination would breed severe resentment within the FDNY rank-and-file." (*Id.*)

The court in the Class Action addressed these objections in its final relief order, and wrote:

> The objections process was held so that nonparties potentially affected by the Proposed Relief Order could voice their concerns about the proposed relief. Unfortunately, the overwhelming majority of the objectors used the process to express displeasure with the court's liability rulings, malign the court for daring to interfere with the culture of the FDNY, and make the utterly baseless suggestion that those individuals who receive priority hiring relief will be unqualified to be firefighters. Most disturbingly, several FDNY supervisors brazenly informed the court that they will not welcome priority hires into their ranks, and will lack respect for priority hires because they do not believe they deserve to be firefighters. These comments reinforce the court's concern that some personnel within the FDNY will resist or refuse to comply with the specific terms and spirit of the relief orders. The court will not hesitate to exercise its equitable authority to enforce all of its orders.

(Memorandum & Order Regarding Final Relief Order, *United States v. City of New York*, No. 07-CV-2067(NGG)(RLM) (E.D.N.Y.), ECF No. 1011, at 2; *see also* Compl. ¶ 36 (referring to order).)

### C.  Plaintiff's Allegations

As noted above, plaintiff is currently an FDNY firefighter and, prior to his appointment as a firefighter, had

worked for fifteen years as an FDNY EMT.  Plaintiff began

working for the FDNY as an EMT in 1999.  (Compl. ¶ 17.)  The

complaint states that both as an EMT and as a firefighter,

plaintiff "ably and satisfactorily performed his duties."  (*Id.*

¶ 21.)  With respect to the Class Action, plaintiff was a member

of the "Delayed-Hire" subclass, (*id.* ¶ 18), and on June 7, 2014,

the FDNY appointed him as a "'priority hire' firefighter in

compliance with the orders of [the] Court."  (*Id.* ¶ 19.)  After

graduating from the Fire Academy, plaintiff was assigned to

Engine Company 257, which is located in the borough of Brooklyn.

(*Id.* ¶ 20.)

### 1.  *Plaintiff's Appointment*

The complaint alleges that, upon plaintiff's

appointment as a firefighter and arrival at Engine Company 257,

defendant Curneen, who at the time held the rank of Captain and

was Engine Company 257's commanding officer, "ordered

humiliating and needless special one-on-one 'training sessions'

for [plaintiff] at the outset of each shift."  (*Id.* ¶ 38.)

Specifically, "Curneen repeatedly ordered [plaintiff] to

'practice' putting his pants and jacket on and [taking them] off

at the beginning of each tour in the presence of the entire

company," based on the premise that plaintiff "did not know how

to put his pants on."  (*Id.*)  The complaint alleges that this

"special training" was "completely unnecessary" and "served to

humiliate [plaintiff] in the presence of his fellow firefighters." (*Id.*)

The complaint further alleges that Curneen retaliated against plaintiff with "abusive performance evaluations." (*Id.* ¶ 39.) According to the complaint, within "a few weeks" of plaintiff's arrival at the firehouse, Curneen gave plaintiff a "failing evaluation based on his spurious and subjective assessments," and "over the next few months, Curneen presented [plaintiff] with a series of failing performance evaluations based on the same bogus subjective assessments." (*Id.*) Plaintiff further asserts that other firefighters "joined in Curneen's abuse," including by "regularly" placing pork and bacon on the firehouse menu after it "became known that [plaintiff] did not eat pork," thereby "forcing [plaintiff] to eat his meals separately." (*Id.* ¶ 40.) Additionally, firefighters "denied [plaintiff] the courtesy and consideration typically shown" to colleagues, including by failing to "check on [plaintiff] at the hospital" and "belittl[ing] his injury" when he suffered a dislocated shoulder, for which plaintiff ultimately required surgery, during a four-alarm fire on July 3, 2014. (*Id.* ¶ 41.)

### 2. *The April 2015 Fire and New York Post Article*

The complaint alleges that on April 2, 2015, plaintiff's company responded to a major fire and, while

plaintiff was inside a burning building, his "oxygen gauge alerted him that his air was dangerously low and needed immediate attention." (*Id.* ¶ 42.) Consequently, plaintiff returned to the fire truck to refill his oxygen tank. (*Id.*) When Curneen learned that plaintiff had done so, he berated plaintiff for abandoning his post and "expressed no concern [regarding] the possible malfunction of, or tampering with" plaintiff's oxygen tank. (*Id.*)

The "next day [plaintiff] reported for duty,"[5] Curneen and others "berat[ed] [plaintiff' falsely for 'leaving his position' at the fire." (*Id.* ¶ 43.) Curneen continued "abus[ing]" plaintiff throughout the day until plaintiff left the station due to stomach pain, which Curneen characterized as "stress." (*Id.* ¶¶ 44-45.) Because of plaintiff's purported "stress," Curneen ordered plaintiff to undergo a psychiatric evaluation and to undertake re-training at the FDNY Academy. (*Id.* ¶ 45.) Under FDNY regulations, because Curneen had directed that plaintiff undergo a psychiatric evaluation, plaintiff was barred from duty until he received a psychiatric clearance from an FDNY psychiatrist. (*Id.*) Plaintiff's re-

---

[5]     As more fully discussed below, the City Defendants contend that plaintiff's Title VII claim is time barred to the extent it arises from occurrences prior to April 9, 2015. It is not clear from the complaint whether the "next day [plaintiff] reported for duty" refers to April 3, 2015, or to the next date on which plaintiff worked a shift (which date may have been after April 3, 2015).

training resulted in a finding of "no deficiencies in [plaintiff's] abilities to perform as a firefighter," and the psychiatric evaluation similarly found "no issues" with plaintiff, and he was cleared to return to duty. (*Id.* ¶ 46.)

On the night of May 16, 2015, approximately three weeks after plaintiff returned to duty at Engine Company 257, Curneen placed a phone call to plaintiff and informed him that an article involving plaintiff would appear the following day in the *New York Post.* (*Id.* ¶ 47.) On May 17, 2015, the *New York Post* published an article under the headline "Firefighters Fear Colleague Who Routinely Flees Fires" (the "Article") in its print and online editions. (*Id.* ¶ 48.) The Article, which is attached as Exhibit A to the complaint, (ECF No. 23-1), features a picture of plaintiff enlarged from an informal group photograph of Engine Company 257. (Article at 3; *see also* Compl. ¶ 48 (noting photograph).)

The Article also features a photograph purportedly showing plaintiff outside of a burning building, (Article at 3; *see also* Compl. ¶ 48 (noting photograph).), which the Article characterizes as "show[ing] [plaintiff] at the curb next to an FDNY vehicle while fellow firefighters march up steps into a house engulfed in black smoke." (Article at 2.) Additionally, the Article states that at the April 2, 2015 fire, plaintiff's "irked captain radioed a 'mayday' after discovering [plaintiff]

was AWOL" from his assigned post as the "'backup' to the nozzle man carrying the hose into the burning two-story building," leaving "just two firefighters . . . to haul the heavy hose up a long staircase and spray water on the flames." (*Id.*)

The Article, which cites "FDNY insiders" as its sources, identifies plaintiff by name, states that he is a priority hire, and asserts that according to sources, plaintiff had "managed to evade the smoke and flames" several times since his hiring. (Article at 1-4; *see also* Compl. ¶ 49.) The Article further states that "department members are afraid to openly complain or criticize [plaintiff], who is [B]lack," because of his status as a priority hire. (Article at 3-4; *see also* Compl. ¶ 49.) Further, the Article quotes FDNY "sources" who portray plaintiff as a safety risk, (Article at 2), and, based on disclosures about plaintiff's medical and personnel file, reports that plaintiff "took several days of medical leave for stress following the April 2[, 2015] fire and several months' medical leave after a fire in a six story apartment building" in July of 2014. (Article at 5; Compl. ¶ 51.)

The complaint alleges, "[u]pon information and belief," that Curneen, Lemonda, and Gala were among the Article's FDNY sources. (Compl. ¶¶ 52-54.) More specifically, the complaint alleges that a "blog post" identified Curneen as a source of "private information" about plaintiff, (*id.* ¶ 52),

that Lemonda provided plaintiff's "personal and confidential information" for the Article, (*id.* ¶ 53), and that Gala also provided "personal and confidential information," as well as the photograph purporting to show plaintiff standing on the curb at the April 2, 2015 fire. (*Id.* ¶ 54.)

The complaint also alleges that the John Doe defendants named in the complaint were sources for the Article, (*id.* ¶ 55), that Curneen, Lemonda, Gala, and/or the John Doe defendants were the sources of information provided to the *New York Post* about plaintiff's "post-fire medical leave for stress," (*id.* ¶ 56), and that all information that was provided to the *Post* was provided "maliciously" and in violation of federal and state laws and regulations. (*Id.* ¶¶ 55-56.)

According to the complaint, the Article "spawned" what plaintiff alleges was a "full-throated media lynching" of plaintiff as an "Affirmative Action Firefighter," including by, among other outlets, *The Daily Mail*, *frontpagemag.com*, *scallywagandvagabond.com*, and *breitbart.com*. (*Id.* ¶¶ 58-59.) The *scallywagvagabond.com* article "feature[s] a full page photo[graph] of [plaintiff]'s face," and [is] headlined "Should Michael D. Johnson, FDNY firefighter be fired?" [sic]. (*Id.* ¶ 59 (quoting Compl. Ex. D, ECF No. 23-4, at 1-2.).) It also states that "[a]ccording to the Canarsie captain," *i.e.*, the captain of Engine Company 257, "Tragic Johnson came to irk

fellow fire fighters [sic] after noted to be AWOL during an April 2 three alarm fire." (Compl. Ex. D, at 3; *see also* Compl. ¶ 59.)

Additionally, certain internet postings based on the *New York Post* Article were met with "blatantly racist" comments and threats, including a statement that plaintiff "should be gotten rid of one way or [an]other," and a warning that if plaintiff turned his back in another fire, "[h]e may be missing in the inferno." (Compl ¶ 59 and Ex. G, ECF No. 23-7 at 6 of 7.) The complaint alleges that the "false reports" of plaintiff's conduct as a firefighter and resulting media coverage "stoking racial animus against [plaintiff] as a priority hire . . . caused [plaintiff] and his family shame, embarrassment, humiliation, and emotional distress," and injured plaintiff's reputation. (*Id.* ¶ 61.)

Additionally, the complaint alleges that after the Article's publication, Nigro "became aware of [it] and the fact that it was evidence of retaliation against priority hires." (*Id.* ¶ 66.) In response to the Article, Nigro allegedly "directed a perfunctory investigation." (*Id.*) The complaint alleges that plaintiff told investigators that Curneen had prior knowledge of the Article. (*Id.*) The complaint also alleges that plaintiff told investigators that Gala had been observing the April 2, 2015 fire from the vantage point from which the

photograph purporting to show plaintiff standing on the curb had been taken. (*Id.*) The investigation nevertheless was purportedly "'unable' to determine the FDNY source of the leaks to the media," and those officials plaintiff identified as involved in the story's production subsequently received promotions within the FDNY. (*Id.*)

### 3. *EEOC Charge and "Ongoing Retaliation"*

On February 3, 2016, plaintiff filed a charge of discrimination with the EEOC alleging that the "planting of false and vicious reports . . . about his conduct at fires and disclos[ure] [of] his personnel and medical records" in connection with the Article constituted retaliation against him for having been hired as a firefighter. (*Id.* ¶ 63.)

On September 24, 2016, several months after plaintiff filed the EEOC charge, plaintiff attended a rally in Harlem with other FDNY members on his regular day off, to "discuss discrimination against minorities within FDNY." (*Id.* ¶ 64.) A few days after that,[6] "FDNY Associate Disciplinary Counsel" summoned plaintiff to the office of the Bureau of Investigations and Trials, purportedly to inform him of the "status of their investigation, which had been closed six months prior." (*Id.* ¶ 64.) According to the complaint, the true purpose of summoning

_____

[6]     The complaint's exact wording is "[f]ive days later, on September 30, 2016," (Compl. ¶ 64), but September 30 is six days after September 24. The exact date to which the complaint refers is thus unclear.

plaintiff was to "inform [him] that the FDNY was watching him and that further retaliation should be expected." (*Id.*)

## II. Procedural History

As noted above, on February 3, 2016, plaintiff filed an EEOC charge alleging, in relevant part, retaliation against plaintiff for engaging in protected conduct. (*Id.* ¶¶ 8, 63.) On September 2, 2016, plaintiff received a Notice of Right to Sue from EEOC. (*Id.* ¶ 8.) Plaintiff commenced the instant action by filing an initial complaint, (ECF No. 1), on November 18, 2016. (Compl. ¶ 8.) Plaintiff subsequently filed the amended complaint on March 1, 2017.

The complaint asserts various claims under federal, New York State, and New York City law. Plaintiff's first through fifth claims for relief assert claims seeking damages under federal, state, and local employment law. More specifically, the complaint's first cause of action is asserted against the City and alleges retaliation in violation of Title VII. (*Id.* ¶¶ 68-71.) The complaint's third and fifth causes of action are also asserted against the City and allege retaliation in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 296, and in violation of the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-107, respectively. (Compl. ¶¶ 75-77, 82-84.) The second and fourth causes of action allege retaliation in violation of the NYSHRL

and NYCHRL, respectively, by Nigro, Gala, Curneen, Lemonda, and the John Doe defendants.  (*Id.* ¶¶ 72-74, 78-81.)

The complaint's sixth and seventh causes of action allege retaliation in violation of plaintiff's First Amendment rights under 42 U.S.C. § 1983 ("section 1983").  (*Id.* ¶¶ 85-93.) The sixth cause of action is asserted against Nigro, Gala, Curneen, Lemonda, and the John Doe defendants, while the seventh is asserted against the City.  (*Id.*)  The eighth cause of action alleges a violation of plaintiff's rights under 42 U.S.C. § 1981 ("section 1981"), and is asserted against all defendants.  (*Id.* ¶¶ 94-98.)  The ninth cause of action is styled as one for "Common Law Intentional or Negligent Infliction of Emotional Distress," and is asserted against Nigro, Gala, Curneen, Lemonda, and the John Doe defendants.  (*Id.* ¶¶ 99-102.) Finally, the tenth cause of action asserts that all defendants are in contempt of two orders entered in the Class Action: the remedial order entered December 8, 2011 and the final relief order entered October 26, 2012 prohibiting retaliation against Johnson as a priority hire.  (*Id.* ¶¶ 103-10.)

After obtaining leave of court, the City Defendants and Lemonda moved to dismiss the complaint as set forth in their respective moving papers.  The motions were fully briefed and submitted to the court as of June 26, 2017.  The City Defendants' motion to dismiss seeks to have Nigro, who is sued

in his official capacity, dismissed from this action.  The City

Defendants also seek dismissal of each of plaintiff's causes of

action as against them, with the exception of his Title VII

claims arising on and after April 9, 2015 and his New York State

and New York City Human Rights Law claims.  Lemonda seeks

dismissal of each of plaintiff's causes of action as against

him.  Plaintiff opposes both motions in their entirety.

## Legal Standard

"To survive a motion to dismiss pursuant to Rule

12(b)(6), a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim for relief that is plausible

on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570

(2007)).  A claim is plausible on its face when it contains

sufficient factual content to "allow[] the court to draw the

reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

In applying Rule 12(b)(6), courts must generally

accept as true all allegations stated in the complaint and draw

all reasonable inferences in favor of the plaintiff.  *Kassner v.

2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007)

(citations omitted).  Importantly, however, "the tenet that a

court must accept as true all of the allegations contained in a

complaint is inapplicable to legal conclusions," *Iqbal*, 556 U.S.

at 678 (citing *Twombly*, 550 U.S. at 555), as well as to any "legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (citations omitted). It is also inapplicable to "[t]hreadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

Of particular importance in light of the allegations in the complaint here, "[t]he *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotations and citations omitted); *accord Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008). Additionally, although "[t]he plausibility standard is not akin to a 'probability requirement,'" pleading "facts that are 'merely consistent with' a defendant's liability" does not suffice to establish plausibility. *Iqbal*, 556 U.S. at 678 (citing and quoting *Twombly*, 550 U.S. at 556-57). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" nor will a complaint that merely "tenders 'naked assertions' devoid of

'further factual enhancement.'" *Id.* (citing and quoting *Twombly*, 550 U.S. at 555, 557.

In adjudicating a Rule 12 motion to dismiss, a court may generally "look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). However, "[d]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered," and "a document upon which the complaint solely relies and which is integral to the complaint may [also] be considered." *Id.* (internal quotations, citations, and emphasis omitted). Here, the court may properly consider the Article and all other attachments to the complaint. As noted above, the court may also consider orders in the Class Action "to establish the fact of such litigation and related filings." *Kramer*, 937 F.2d at 774; *see also Bentley*, 852 F. Supp. 2d at 382 n.5.

## Discussion

### I.   Claims Against Nigro

The City Defendants seek Nigro's dismissal from this action. (City Mem. at 20-21.) Nigro is named as a defendant in the complaint's second, fourth, sixth, eighth, ninth, and tenth causes of action, and each indicates that he is sued "in his official capacity." (*See* Compl. ¶¶ 72-74, 78-81, 85-89, 94-110.) The City Defendants contend that Nigro should be

dismissed because he is sued in his official, rather than individual, capacity, and therefore the City, as the governmental entity of which Nigro is an official, and which is a named defendant in this action, is the "real party in interest."  (City Mem. at 20-21.)

Plaintiff disagrees, and contends that Nigro is a necessary party to this action because the complaint seeks declaratory and injunctive relief, and seeks to have all defendants held in contempt of court.  (Opp. at 23-24.)  In support of his contention that Nigro is a necessary party, plaintiff cites two authorities: *Kraebel v. New York City Dep't of Housing Preservation & Development*, No. 90-CV-4391(CSH), 1994 WL 132239 (S.D.N.Y. Apr. 14, 1994), and Rule 19(a)(1)(A).

Plaintiff's argument is unavailing.  *Kraebel* concerned allegations of undue burdens and delays in processing applications for certain cash reimbursements under a New York real estate tax credit program.  1994 WL 132239 at *1.  The defendants, two city agencies that jointly administered the program, sought to join the Commissioner of the New York State Department of Housing and Community Renewal ("DHCR"), in his official capacity, as a necessary party under Rule 19(a), and the court granted their motion.  *Id.*  In concluding that DHCR's Commissioner was a necessary party, the court noted that persons seeking the cash reimbursements at issue were required to submit

certain documents "which must be obtained from DHCR." *Id.* at *2. The court also wrote that the defendants "will not grant a[] [cash reimbursement] application until they have audited the records and orders issued by DHCR . . . to verify that the owner has not overstated the amount of [cash reimbursement] due." *Id.*

The court further noted that, absent joinder of DHCR's Commissioner, "injunctive relief granted in th[e] case would extend only to the present defendants and would have no effect on DHCR's processing of the essential documentation." *Id.* at *4. Absent joinder of the Commissioner, then, an injunction would "not fully remedy the unconstitutional procedures" if DHCR is found to be "partially or wholly responsible for the [challenged] delays." *Id.*

Plaintiff is therefore correct that in *Kraebel*, the DHCR Commissioner was joined as a necessary party in his official capacity, but plaintiff ignores that DHCR was the real party in interest. *Kraebel* is thus in line with the proposition that "official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). This proposition, in turn, supports the City Defendants' argument that Nigro should be dismissed because he is sued only in his

official capacity, and the City, which is the "real party in interest," is a named defendant.  (City Mem. at 20-21.)

Additionally, the court finds unavailing plaintiff's contention that Nigro should not be dismissed because the complaint "alleges facts upon which Nigro can be held liable for damages, whether the suit is styled as a claim in his official or personal capacity."  (Opp. at 23.)  The difference between an individual-capacity suit and an official-capacity suit is significant and substantial: an official-capacity suit is not, in reality, a suit against the named defendant.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." (citation omitted)); *see also Hafer*, 502 U.S. at 27 ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them." (citations omitted)).  The decision to bring one or the other therefore "has consequences."  *Martinez v. O'Leary*, No. 11-CV-1405(ENV)(JO), 2013 WL 3356983 at *3 (E.D.N.Y. July 3, 2013).

Here, plaintiff has chosen to bring an official-capacity suit against Nigro, and it is therefore irrelevant whether the complaint pleads facts upon which Nigro could be

held liable in his individual capacity.[7]  Because Nigro is sued
only in his official capacity, the City, which the complaint
also names as a defendant, is the real party in interest.  *See*,
*e.g.*, *Hafer*, 502 U.S. at 25.  Dismissal of an official-capacity
suit is proper in such circumstances, *see*, *e.g.*, *Martinez*, 2013
WL 356983 at *3 (collecting cases), and accordingly, the City
Defendants' motion to dismiss all claims against Nigro in his
official capacity is granted.

Further, although plaintiff's briefing suggests that
plaintiff may wish to hold Nigro liable for damages, (*see* Opp.
at 23 (stating that the complaint "alleges facts upon which
Nigro can be held liable for damages"), plaintiff has had two
opportunities to plead his causes of action against Nigro in his
individual capacity.  Plaintiff has not done so, and has only
belatedly suggested he may seek to recover against Nigro
individually.  Accordingly, plaintiff is denied leave to re-
plead his causes of action against Nigro.

## II.  Employment Discrimination Claims

As noted above, the complaint asserts retaliation
claims against the City under Title VII, as well as under the

---

[7]     The court notes that in *Hafer*, to which plaintiff cites in arguing that
Nigro should not be dismissed, the Supreme Court held that state officials
may be sued in their individual capacities under section 1983 and that
officials may not claim immunity or raise an Eleventh Amendment defense
"solely by virtue of the 'official' nature of their acts."  502 U.S. at 30.
Therefore, *Hafer* fails to support plaintiff's argument that the instant
action should not be dismissed as against Nigro in his official capacity.

New York State and New York City Human Rights Laws against all
defendants.  Lemonda has moved to dismiss the NYSHRL and NYCHRL
claims asserted against him in the complaint's second and fourth
claims for relief.  (Lemonda Mem. at 8-13.)  The City Defendants
have moved to dismiss as time barred plaintiff's Title VII
claims arising out of events that occurred before April 9, 2015.
(City Mem. at 5-6.)

### A.    Lemonda

"The NYSHRL allows for individual liability under two
theories: (1) if the defendant has an ownership interest in the
employer or has the authority to hire and fire employees, and
(2) if the defendant was aiding and abetting the unlawful
discriminatory acts of others."  *Setelius v. Nat'l Grid Elec.
Servs. LLC*, No. 11-CV-5528(MKB), 2014 WL 4773975, at *34
(E.D.N.Y. Sept. 24, 2014) (internal citations and quotation
marks omitted) (citing N.Y. Exec. L. § 296(1)-(2), (6)); *see
also* N.Y. Exec. L. § 296(6) ("It shall be an unlawful
discriminatory practice for any person to aid, abet, incite,
compel or coerce the doing of any of the acts forbidden under
this article, or to attempt to do so.").  Lemonda correctly
contends that nothing in the complaint alleges that he has an
ownership interest in his employer or the authority to hire and
fire employees.  (Lemonda Mem. at 9.)  The complaint therefore

does not state a claim against Lemonda individually on the ownership basis.

Lemonda further contends that the complaint does not adequately plead that he aided or abetted the unlawful discriminatory acts of others. (*Id.* at 10.) Under the NYSHRL, "liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor." *Redd v. New York State Div. of Parole*, 923 F. Supp. 2d 371, 392 (E.D.N.Y. 2012) (quoting *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999)). Once principal liability is established, an individual can be held liable as an aider and abettor where he "actually participates" in the conduct giving rise to a claim under the NYSHRL. *Feingold v. New York*, 366 F.3d 138, 157-58 (2d Cir. 2004) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)).

As to principal liability, in order to establish a retaliation claim under the NYSHRL, "[a] plaintiff must establish a *prima facie* case of retaliation by showing that (1) he participated in a protected activity, (2) the defendant was aware of the protected activity, (3) he suffered an adverse employment action, and (4) there was causal connection between the protected activity and the adverse employment action."

*Messinger v. JPMorgan Chase Bank, N.A.*, 126 F. Supp. 3d 376, 387 (S.D.N.Y. 2015) (citing *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013)). Once a plaintiff establishes a *prima facie* case, the defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (citing *Zann Kwan*, 737 F.3d at 845). If the defendant carries this burden, "the plaintiff must demonstrate that the defendant's explanation is a mere pretext for retaliation." *Id.* (citing *Zann Kwan*, 737 F.3d at 845). At this stage, the court need only determine whether plaintiff has adequately pleaded a *prima facie* NYSHRL retaliation claim, and concludes that he has.

The complaint alleges that plaintiff participated in the Class Action, which challenged unlawful employment discrimination, and accepted appointment as a firefighter pursuant to a remedial order entered in that case. (Compl. ¶¶ 2, 18-19.) Thus, plaintiff engaged in protected activity. *See* N.Y. Exec. Law § 296(1)(e), (3-a)(c), and (7) (each providing that "oppos[ing] any practices forbidden under this article or . . . fil[ing] a complaint, testif[ying] or assist[ing] in any proceeding under this article" constitute protected conduct); *see also Kunzler v. Canon, USA, Inc.*, 257 F. Supp. 2d 574, 579 (E.D.N.Y. 2003) ("The 'protected activity' element of plaintiff's case turns upon whether the employee has protested an 'unlawful employment practice,' within the meaning of Title

VII." (citation omitted)); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 220-21 n.5 (E.D.N.Y. 2014) ("Since the NYSHRL statutory language is the same, and the New York Court of Appeals has consistently stated that federal Title VII standards are applied in interpreting the NYSHRL, this Court will continue to interpret the standard for retaliation under the NYSHRL in a manner consistent with Title VII jurisprudence." (collecting cases)).

Further, there can be no dispute that the City was aware of plaintiff's protected conduct; the City appointed plaintiff as a priority firefighter as a result of his protected conduct. (Compl. ¶¶ 18-19.) Additionally, the complaint alleges that Curneen, Gala, and Lemonda were sources for the Article, which is attached to the complaint and reports that "department members are afraid to openly complain or criticize [plaintiff], who is black, because he was hired under a court order to increase minority hiring in the FDNY." (Article at 3.) The Article also states that "[i]nsiders insisted they were not targeting [plaintiff] because he was a 'priority hire,'" (*id.* at 5), indicating the sources' awareness that plaintiff was a priority hire. Taking as true plaintiff's allegations that Curneen, Gala, and Lemonda were the Article's sources, the statements attributed to them in the Article permit an inference

that Curneen, Gala, and Lemonda were aware of plaintiff's

protected conduct as well.[8]

Turning to adverse employment action and causation,

the court notes that the anti-retaliation provisions of the

NYSHRL, like the anti-retaliation provisions of Title VII "cover

a broad range of employer conduct, prohibiting any 'materially

adverse' activity that might 'dissuade a reasonable worker from

making or supporting a charge of discrimination.'" *Lewis v.*

*Erie Cty. Med. Ctr. Corp.*, 907 F. Supp. 2d 336, 350 (W.D.N.Y.

2012) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548

U.S. 53, 68 (2006) and *Thompson v. N. Am. Stainless*, LP, 562

U.S. 170, 173-74 (2011)).

The complaint alleges that despite FDNY regulations

and New York and federal laws prohibiting disclosure of medical

records, and the disclosure of firefighter personnel records

without the express written consent of a firefighter or a court

order, at some point prior to May 17, 2015, Curneen, Gala, and

Lemonda provided plaintiff's personal and confidential

information and, in Gala's case, a photograph purportedly of

plaintiff to the *New York Post* for use in connection with the

Article.  (Compl. ¶¶ 52-54, 56, 60, 101.)  As discussed above,

---

[8]    The court also notes that, because the motion before it is a motion to
dismiss, the court must draw all reasonable inferences in plaintiff's favor,
but need not credit the substance of the allegation that the FDNY "insiders"
quoted in the Article were not targeting plaintiff because of his status as a
priority hire.

the Article portrays plaintiff in an extremely negative light, including by referring to him as a "firefighter in name only," stating that his colleagues had nicknamed him "Tragic Johnson," portraying plaintiff to be so inept as to be a safety risk, and generally suggesting that plaintiff is unfit to serve as a firefighter. (Article at 1-4.)

The Article also cites FDNY sources who publicly revealed medical and personnel information about plaintiff, stated that plaintiff attempted three times to pass the fire academy, was sent twice for retraining, requested not to be returned to the Canarsie firehouse (*i.e.*, Engine Company 257) after retraining, and reported his salary, medical leave status, and age. (Article at 4-5; *see also* Compl. ¶¶ 48-51, 57.) Additionally, the complaint alleges that the Article was carried not only in the *New York Post*, but spawned coverage in various other publications. (*See* Compl. ¶ 58.) The complaint, on information and belief, further alleges that defendants Gala, Curneen, Lemonda, and John and Jane Does were the sources of unauthorized disclosures of medical and personnel information and derogatory statements in the Article. (Compl. ¶¶ 52-56.)

The complaint's allegations regarding the Article and the roles of Gala, Curneen, and Lemonda in its publication, together with the inferences reasonably drawn from these allegations, suffice to allege a materially adverse and

retaliatory employment action.  Additionally, drawing all inferences in plaintiff's favor from the references to his status as a priority hire in the Article, the complaint adequately alleges a causal connection between his participation in protected activity and the adverse action.

The complaint's allegations about plaintiff's treatment at Engine Company 257 also establish a *prima facie* principal liability case under the NYSHRL.  As discussed above, plaintiff alleges that Curneen gave plaintiff "humiliating" and "unnecessary" individual "training sessions" in the "presence of the entire company," during which plaintiff was ordered to practice putting on his pants, (*id.* ¶ 38), and wrote plaintiff baseless failing performance reviews.  (*Id.* ¶ 39.) Additionally, plaintiff's colleagues essentially forced him to eat his meals alone because of his dietary restrictions against pork and belittled him when he was injured during a fire and underwent shoulder surgery as a result.  (*Id.* ¶¶ 40-41.)

Taken together, these allegations suffice to establish a materially adverse employment action, even though each individual action alleged may not give rise to liability.  *See Cox v. Quick & Reilly, Inc.*, 401 F. Supp. 2d 203, 217 (N.D.N.Y. 2005) ("Adverse employment action is defined broadly, and includes 'discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand,' as well as lesser

actions, such as 'negative evaluation letters.'" (quoting *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001)); *Timothy v. Our Lady of Mercy Med. Ctr.*, No. 03-CV-3556(RCC), 2004 WL 503760, at *6 (S.D.N.Y. Mar. 12, 2004) ("Even if none of the actions that a plaintiff alleges could individually be characterized as adverse, a series of actions taken against a plaintiff may, in the aggregate, constitute such conduct." (citing *Fowler v. New York City Transit Auth.*, No. 96-CV-6796, 2001 WL 83228, at *7 (S.D.N.Y. Jan.31, 2001) and *Reiter v. Metro. Transit Auth.*, No. 01-CV-2762, 2002 WL 31190167, at *10 (S.D.N.Y. Sept. 30, 2002))).

Additionally, plaintiff alleges that the aforementioned treatment began immediately upon his appointment as a priority hire firefighter and arrival at Engine Company 257. (Compl. ¶ 19, 38.) The temporal proximity between the adverse action and plaintiff's protected conduct permits an inference of causation.

Having established that plaintiff has sufficiently stated an NYSHRL retaliation claim, the court concludes that the plaintiff has also sufficiently alleged that Lemonda was involved in, or aided and abetted, that retaliation. The complaint alleges that Lemonda was one of the Article's sources who provided plaintiff's confidential personnel and medical information to the *New York Post*. (Compl. ¶ 53.) Further, as

noted above, the Article attributes statements about priority hires and fear of complaining about or disciplining Black and Hispanic firefighters to its FDNY sources. (Article at 3-4.) This permits an inference that those sources were aware that plaintiff was a priority hire and thus a racial minority who had engaged in protected conduct. Finally, Curneen's involvement in the alleged materially adverse actions that took place at Engine Company 257 and advance notice of the Article permit an inference that the Article was part of the same pattern of conduct. Therefore, one who assisted in the release of plaintiff's information and the publication of the Article would be an aider and abettor of the retaliatory conduct.

As to plaintiff's NYCHRL claim against Lemonda, the court notes that the Second Circuit has directed courts to "analyze NYCHRL claims separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)(citations omitted). The reason for this direction, however, is that the NYCHRL makes actionable a broader range of conduct than do its state and federal counterparts. *See id.* Lemonda concedes that this broader range of actionable conduct is the only material difference between the NYSHRL and the NYCHRL. (Lemonda Mem. at 12.)

Here, plaintiff has stated a claim under the more restrictive NYSHRL. Additionally, the court notes that "[t]he same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is 'virtually identical.'" *Feingold*, 366 F.3d at 158 (quoting *Dunson v. Tri-Maintenance & Contractors, Inc.*, 171 F. Supp. 2d 103, 113-14 (E.D.N.Y. 2001)). Because the court has concluded that the complaint adequately states a claim for aiding and abetting liability against Lemonda under the NYSHRL, the court also concludes that the complaint states a claim for aiding and abetting liability against Lemonda under the NYCHRL. Accordingly, Lemonda's motion to dismiss the plaintiff's NYSHRL and NYCHRL claims against him is denied.

## B. City Defendants

At the outset, the court notes that the City Defendants do not contend, at least for present purposes, that plaintiff has failed to state a Title VII claim. (*See* City Repl. at 6.) Instead, the City Defendants seek to dismiss Title VII claims arising before April 9, 2015. Here, the complaint alleges that defendants retaliated against plaintiff from the date he was assigned to Engine Company 257 on June 7, 2014, "by creating a hostile work environment, by providing false accounts of his conduct as a firefighter, and by intentionally and illegally disclosing Johnson's confidential and sensitive

medical and personnel information to individuals and entities outside of the [FDNY].”  (Compl. ¶ 69.)  The complaint therefore asserts retaliation and retaliatory hostile work environment claims based on discrete acts.

### 1.  *Alleged Discrete Retaliatory Acts*

A Title VII claim accrues, and the limitations period begins running, “when a prospective plaintiff knew or should have known of the adverse treatment upon which he or she will ultimately sue.”  *Semper v. New York Methodist Hosp.*, 786 F. Supp. 2d 566, 576–77 (E.D.N.Y. 2011) (internal quotation marks and citations omitted); *accord Morse v. Univ. of Vermont*, 973 F.2d 122, 125 (2d Cir. 1992) (“Under federal law, a claim accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action.” (internal quotation marks and citations omitted)).

Plaintiff contends that the application of the continuing violation doctrine renders the complaint timely as to all of the complaint’s allegations.  (Opp. at 19-20.)  “[U]nder the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone.”  *Chin v. Port Auth. of New*

*York & New Jersey*, 685 F.3d 135, 155–56 (2d Cir. 2012) (quoting *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993), *abrogated on other grounds by Kasten v. Saint–Gobain Performance Plastics Corp.*, 563 U.S. 1, (2011)).

However, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Chin*, 685 F.3d at 156 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). Thus, discrete acts falling outside the limitations period "cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Id.* at 157. Plaintiff's preferred reading of the continuing violation doctrine is incorrect and overbroad: it cannot save untimely claims based on discrete acts.

The court concludes that under *Morgan* and *Chin*, plaintiff cannot recover under Title VII for those "discrete acts" of which plaintiff knew or had reason to know before April 9, 2015, including the alleged retaliatory conduct that took place in June 2014, immediately upon plaintiff's arrival at Engine Company 257, and in the months following. (Compl. ¶ 37-41.) Additionally, as noted above, the complaint does not make clear the date on which Curneen allegedly ordered Johnson to

undergo a psychiatric evaluation and undertake re-training in the wake of the April 2, 2015 fire, but if that date was before April 9, 2015, plaintiff may not recover under Title VII for those "discrete acts."

The court notes that its conclusion as to the discrete acts for which plaintiff may recover appears to differ from the City Defendants' contention in one important respect: the City Defendants' motion seeks dismissal of plaintiff's claims arising from any events that "occurred before April 9, 2015." (City Mem. at 6.) Plaintiff alleges that his private, personal, and confidential information was disclosed to the *New York Post* in the wake of a fire that took place on April 2, 2015. (*See* Compl. ¶¶ 51-57.) Taking the complaint's allegations as true, it appears that plaintiff would have had no reason to know of these disclosures until May 17, 2015, the date on which the Article was published. (*See* Article at 1.) The City Defendants do not dispute that May 17, 2015 falls within the Title VII limitations period. Plaintiff may therefore recover for discrete retaliatory actions taken in furtherance of the publication of the Article even if those actions occurred prior to April 9, 2015.

The foregoing determination regarding the continuing violation doctrine does not mean, however, that events and actions of which plaintiff became, or should have become, aware

prior to April 9, 2015 are irrelevant to plaintiff's Title VII
claim.  With respect to liability for discrete acts, pre-April
9, 2015 events may provide circumstantial evidence of
retaliatory intent, for instance, by establishing that there was
a "close temporal connection between . . . plaintiff's protected
activity and [defendants'] adverse action[s]."  *Mugavero v. Arms
Acres, Inc.*, 680 F. Supp. 2d 544, 560 (S.D.N.Y. 2010) (citing
*Feingold*, 366 F.3d at 156-7 and *Reed v. A.W. Lawrence & Co.,
Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).

### 2.    *Alleged Retaliatory Hostile Work Environment*

Although the continuing violation doctrine cannot save
claims based on discrete acts, plaintiff also asserts a
retaliatory hostile work environment claim.  (Compl. ¶ 73.)  The
Supreme Court has held that "consideration of the entire scope
of a hostile work environment claim, including behavior alleged
outside the statutory time period, is permissible for the
purposes of assessing liability, so long as an act contributing
to that hostile environment takes place within the statutory
time period."  *Morgan*, 536 U.S. at 105.  Therefore, if the
complaint sufficiently alleges a retaliatory hostile work
environment claim, a jury's consideration of acts and events of
which plaintiff became aware outside the limitations period,
here, prior to April 9, 2015 may be appropriate.  *See Zhengfang
Liang v. Cafe Spice SB, Inc.*, 911 F. Supp. 2d 184, 210 (E.D.N.Y.

2012) ("In addition to relying on discrete employment actions to prove retaliation, a plaintiff can also try to prove that a retaliatory hostile work environment existed.").

"To establish a claim for retaliatory hostile work environment, 'a plaintiff must satisfy the same standard that is applied generally to hostile work environment claims regarding the severity of the alleged conduct.'" *Bacchus v. New York City Dep't of Educ.*, 137 F. Supp. 3d 214, 244 (E.D.N.Y. 2015) (quoting *Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 438 (E.D.N.Y. 2009)); *accord Liang*, 911 F. Supp. 2d at 210 (collecting cases). "The test for 'hostile work environment' has both an objective and a subjective component: 'A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it.'" *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir. 2004) (quoting *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)).

As to the objective component, "[w]hether a reasonable person would find a given work environment to be hostile depends on the totality of the circumstances; 'considerations include: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work

performance.'" *Id.* (quoting *Brennan*, 192 F.3d at 319). In other words, a plaintiff must show, in relevant part, that "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered."[9] *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (citing *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001)).

At the Rule 12 motion to dismiss stage, the court concludes that the complaint sufficiently alleges facts that would support a conclusion that a reasonable person would find plaintiff's work environment hostile, and that plaintiff perceived it to be hostile.

The complaint alleges that Curneen "repeatedly . . . humiliate[d] [plaintiff] in the presence of his fellow firefighters who watched him have to put on his pants and boots" at the beginning of each shift. (Compl. ¶ 38.) It also alleges that Curneen gave plaintiff a number of baseless "failing performance reviews" over a period of months, (*id.* ¶ 39), that plaintiff's colleagues at Engine Company 257 learned that plaintiff did not eat pork, and "regularly" planned meals that included pork, forcing plaintiff to eat separately. (*Id.* ¶ 40.)

---

[9]    A hostile work environment finding thus represents a finding that an employer *implicitly* altered the terms and conditions of employment. *See Mormol*, 364 F.3d at 58 (characterizing the hostile work environment inquiry as one as to whether an employer implicitly "alter[ed] the terms and conditions of plaintiff's employment").

Additionally, the complaint alleges that other firefighters belittled a serious on-the-job injury, for which plaintiff underwent surgery. (*Id.* ¶ 41.)

The complaint further alleges that Curneen "berated [plaintiff] falsely for 'leaving his position'" at the April 2, 2015 fire, (*id.* ¶ 43), and baselessly ordered plaintiff to undergo a psychiatric examination and undertake additional training after plaintiff returned to a firetruck from inside a burning building to refill his oxygen tank when his oxygen gauge alerted him that his oxygen supply was "dangerously low." (*Id.* ¶¶ 42-46.) Plaintiff also alleges that Curneen expressed no concern that plaintiff's oxygen tank possibly malfunctioned or had been tampered with. (*Id.* ¶ 42.) Finally, the complaint alleges that plaintiff's private, personal, and confidential information was disclosed by the City Defendants without his consent in connection with the Article, which, as discussed above, portrays plaintiff in a plainly, and severely, disparaging manner, and was widely disseminated to other news and social media platforms, provoking racist and threatening remarks. (*Id.* ¶¶ 47-58.)

Regarding the subjective component, plaintiff alleges that he has "suffered severe shame, embarrassment, humiliation, emotional distress, and damage to his reputation" as a result of defendants' conduct. (Compl. ¶ 6.) Further, in asserting his

retaliatory hostile workplace causes of action, plaintiff
alleges that he found his workplace to be hostile.  (Compl. ¶¶
69, 71, 73-74, 79-80.)  Based on the foregoing allegations
regarding specific conduct by the defendants, plaintiff's
allegations as to his subjective perception of his workplace as
hostile are not conclusory.

Importantly, the complaint also alleges that Curneen
was the Captain of Engine Company 257 until January 2, 2016,
(Compl. ¶ 14, 38), and had advance knowledge of the existence
and imminent publication of the Article.  (*Id.* ¶ 47.)  Further,
all alleged conduct was connected to plaintiff's assignment to
Engine Company 257.  Based on the nature and extent of Curneen's
alleged involvement, as well as the connection of all
allegations to plaintiff's assignment under Curneen's authority
at Engine Company 257, the court concludes that the
aforementioned allegations sufficiently plead that defendants'
actions constitute part of the same alleged hostile work
environment practice.  *See Villar v. City of New York*, 135 F.
Supp. 3d 105, 132 (S.D.N.Y. 2015) (concluding alleged conduct
was "part of the same actionable hostile work environment
practice" due to "the similarity in perpetrator, unit
assignment, and type of conduct").

Further, assuming the truth all of the complaint's
well-pleaded allegations of fact and drawing all inferences

therefrom in plaintiff's favor, based on the totality of the
circumstances, plaintiff alleges conduct that is frequent,
pervasive, severe, and humiliating enough to create a hostile
work environment.  In connection with the court's discussion of
Lemonda's motion to dismiss plaintiff's NYSHRL and NYCHRL claims
as against him, the court has already concluded that the alleged
retaliatory conduct is causally connected to plaintiff's
protected activity, of which all defendants were allegedly
aware.  Plaintiff has therefore sufficiently pleaded a
retaliatory hostile work environment cause of action.

For the foregoing reasons, the City Defendants' motion
to dismiss plaintiff's Title VII cause of action is granted to
the extent that plaintiff cannot recover under Title VII for
discrete acts about which he became aware prior to that date.
Plaintiff may, however, rely on events occurring prior to April
9, 2015 in (a) seeking to establish the causation element of his
Title VII, NYSHRL, and NYCHRL retaliation claims and (b) seeking
to establish his retaliatory hostile work environment claim.

## III. Federal Civil Rights Claims

### A. Section 1981 Claims

Section 1981 provides, in relevant part, that

> [a]ll persons within the jurisdiction of the
> United States shall have the same right in every
> State and Territory to make and enforce
> contracts, to sue, be parties, give evidence, and
> to the full and equal benefit of all laws and

proceedings for the security of persons and
property as is enjoyed by white citizens.

42 U.S.C. § 1981(a).

Additionally, section 1981 defines the term "make and
enforce contracts" to include "the making, performance,
modification, and termination of contracts, and the enjoyment of
all benefits, privileges, terms, and conditions of the
contractual relationship."  42 U.S.C. § 1981(b).  The statutory
rights protected under section 1981 are "protected against
impairment by nongovernmental discrimination and impairment
under color of State law."  42 U.S.C. § 1981(c).

To state a claim under section 1981, a plaintiff must
allege that "(1) he or she is a member of a protected class, (2)
the defendant intentionally discriminated against him or her on
the basis of membership in that protected class; and (3) the
discrimination concerned one of [section] 1981's enumerated
activities."  *Juarez v. Nw. Mut. Life Ins. Co.*, 69 F. Supp. 3d
364, 367 (S.D.N.Y. 2014) (citing *Brown v. City of Oneonta*, 221
F.3d 329, 339 (2d Cir. 2000)).  These elements reflect the
principle that a person can violate section 1981 only by
"[p]urposeful discrimination," which is "conduct motivated by a
discriminatory purpose rather than conduct that merely results
in a disproportionate impact on a particular class."  *Id.*
(quoting and citing *Gen. Bldg. Contractors Ass'n, Inc. v.*

*Pennsylvania*, 458 U.S. 375, 391, 386 (1982)) (internal quotation marks omitted).

Additionally, section 1981 encompasses retaliation claims in employment, *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 446 (2008), which are analyzed under the same standard as a Title VII retaliation claim. *Villavicencio v. Gure-Perez*, 56 F. Supp. 3d 178, 186 (E.D.N.Y. 2014) (citing *Little v. N.E. Util. Serv. Co.*, 299 F. App'x 50, 52 (2d Cir. 2008)). To briefly restate that standard, to state a retaliation claim, a plaintiff must demonstrate (1) that he engaged in protected activity, (2) of which the employer was aware, and (3) that he suffered a materially adverse action, which (4) was causally connected to the protected activity. *See, e.g., id.* at 186-87 (quoting *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013)). Here, plaintiff alleges both discrimination and retaliation claims in violation of plaintiff's section 1981 rights. (Compl. ¶¶ 95-96.)

### 1. *Lemonda*

Lemonda contends that plaintiff has not stated a plausible section 1981 claim against him because the complaint's allegations are "insufficient to infer that [p]laintiff's race was a 'motivating factor' for the release or disclosure of personal, confidential, medical and/or other personnel information," and because plaintiff "has not established that

the action itself amount[s] to discriminatory conduct."
(Lemonda Mem. at 17-18.)  Importantly, Lemonda does not
challenge the complaint's assertion that the alleged
discrimination and retaliation concerned the protected
activities enumerated in section 1981, including the "mak[ing]
and enforce[ment] of contracts," the "enjoyment of all benefits,
privileges, terms and conditions of the contractual and
employment relationship," and the right "to the full and equal
benefit of all . . . laws and proceedings for the security of
persons and property as enjoyed by white citizens."  (Compl. ¶
97; *see also* 42 U.S.C. § 1981(a).)

        The court concludes that the complaint sufficiently
states a section 1981 claim against Lemonda.  The complaint
alleges that plaintiff was a priority hire appointed pursuant to
a court order in the Class Action, (*e.g., id.* at ¶¶ 2-3, 19),
and that Lemonda was one of the FDNY sources quoted in, or who
provided information for, the Article.  (*Id.* ¶ 53.)  As
discussed above, the FDNY sources quoted in the Article, in
turn, clearly indicate their knowledge that plaintiff is a Black
American and a priority hire.  (*See* Article at 1-4.)

        Further, all priority hires are members of racial
minorities because the Class Action dealt with racial
disparities adversely affecting Black and Hispanic applicants in
the FDNY's hiring processes.  *See*, *e.g.*, *United States v. City*

*of New York*, 637 F. Supp. 2d at 79-80 (making clear that the Class Action relates to racial discrimination in hiring). Therefore, knowledge that plaintiff is a priority hire is tantamount to knowledge that plaintiff is a member of a protected class for purposes of 1981. At the motion to dismiss stage, the allegations of defendants' knowledge and the express references to plaintiff's status as a priority hire permit an inference that plaintiff's race was a motivating factor in the alleged disclosure by Lemonda of plaintiff's protected confidential information to the *New York Post* in connection with the Article.

The Article also very clearly reports that its sources questions plaintiff's fitness for his position as a firefighter – its first line states that plaintiff is "a firefighter in name only," (Article at 1), and the Article quotes sources within the FDNY as stating, in substance, that plaintiff is not fit to be a firefighter. (*Id.* at 2.) The alleged discriminatory acts, therefore, clearly concern plaintiff's ability to enjoy the benefit of his status as a class member and employment relationship, both of which section 1981 protects. *See Vill. of Freeport v. Barrella*, 814 F.3d 594, 604 (2d Cir. 2016) (noting that the Supreme Court has construed section 1981 as "forbidding 'racial' discrimination in public or private employment" (citation omitted)).

Additionally, for the reasons discussed above, the complaint sufficiently alleges that plaintiff engaged in activity that section 1981 protects, that his employer and Lemonda were aware of that activity, and that plaintiff suffered a materially adverse employment action, in which Lemonda was personally involved, as a result of his protected activity. Therefore, the complaint sufficiently pleads the elements of both a status-based section 1981 claim and a retaliation-based section 1981 claim against Lemonda.

Further, the court finds unavailing Lemonda's argument that a section 1981 claim cannot lie against him because the complaint both alleges that Lemonda is a supervisory City employee and therefore a state actor, and that Lemonda acted in his personal capacity, not under color of state law, in disclosing information in connection with the Article. (*See* Lemonda Mem. at 18.) The complaint alleges that Lemonda has been on "leave with full pay and benefits" to work at UFOA since September 1, 2009. (Compl. ¶ 15.) Additionally, Rule 8(d) expressly authorizes pleading in the alternative, and Rule 8(d)(3) further provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Therefore, the complaint sufficiently alleges that Lemonda was not acting under color of state law when he disclosed plaintiff's private and confidential information to

the *New York Post*, and it is of no moment that the complaint also pleads alternative theories or inconsistent allegations.

Accordingly, Lemonda's motion to dismiss plaintiff's section 1981 claim as against him is denied.

### 2. *City Defendants*

The City Defendants contend that plaintiff's section 1981 claims should be dismissed as against them because they are state actors, and section 1983 therefore provides the exclusive remedy against them for alleged violations of rights guaranteed under section 1981. (City Mem. at 7-8.)

In *Jett v. Dallas Independent School District*, the Supreme Court concluded that "the express cause of action for damages created by [section] 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in [section] 1981 by state governmental units." 491 U.S. 701, 733 (1989). In reaching this conclusion, the Supreme Court reasoned that the section 1981 private right of action was an exercise of the "judicial power to imply or create remedies," and that the exercise of this power would not be appropriate "in the face of an express declaration by Congress concerning the scope of remedies under a particular statute," in this case section 1983. *Id.* at 732.

The Civil Rights Act of 1991, enacted after the *Jett*, decision amended section 1981, and "there is some question as to

whether [it] . . . create[d] an implied private right of action against state actors under [section] 1981." *Whaley v. City Univ. of New York*, 555 F. Supp. 2d 381, 401 (S.D.N.Y. 2008) (citations omitted). The Supreme Court has not addressed the question. In a summary order, the Second Circuit has indicated that *Jett*'s analysis remains valid. *See Gladwin v. Pozzi*, 403 F. App'x 603, 605 (2d Cir. 2010) ("As the district court noted, Gladwin's [section] 1981 claims are encompassed by her [section] 1983 claims, and both are therefore analyzed under [section] 1983." (citing *Jett*, 491 U.S. at 735)). Additionally, a number of district courts within the Second Circuit have concluded that *Jett*'s holding that section 1983 provides the exclusive remedy for state actors for alleged violations of rights guaranteed by section 1981 remains controlling. *Whaley*, 555 F. Supp. 2d at 401 (stating that the court "like other district courts in this Circuit, decline[s] to deviate from the Supreme Court's analysis of [section] 1981 in *Jett*" and collecting cases). In light of the foregoing authority, the court declines to deviate from *Jett*.

Here, plaintiff has expressly pleaded his claim for violations of his rights under 1981 as a private right of action claim, not as one for relief under 1983. (*See* Compl. ¶¶ 94-98.) In pleading his section 1981 claim, plaintiff asserts that, "[Lemonda], and some or all of the individual defendants,[] were

not acting in their official capacities under state or local law when they took steps to retaliate against [plaintiff]."  (*Id.* ¶ 96.)

Although, as discussed above, plaintiff sufficiently alleges that Lemonda did not act under color of state law, and therefore that Lemonda is susceptible to a suit brought under section 1981's implied private right of action, plaintiff does not allege any such facts with respect to Gala or Curneen. Instead, the complaint alleges that, at all relevant times, Gala and Curneen have been City employees, and "[a]s a general rule, state employment is sufficient to render the defendant a state actor, which, in turn, is sufficient for a finding of action taken under color of state law for purposes of [section] 1983." *Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 426 (S.D.N.Y. 2012) (internal quotation marks and citations omitted). Further, the City is by definition a state actor.

Accordingly, under *Jett*, plaintiff does not state a section 1981 claim against the City Defendants, because under *Jett*, a claim asserted under section 1981's implied private right of action may not lie against state actors.  The City Defendants' motion to dismiss plaintiff's section 1981 claim against them is therefore granted.

The amended complaint, however, clearly seeks to allege that the City Defendants violated plaintiff's substantive

rights protected by section 1981.  It appears to the court that such a claim may be viable, if plaintiff chooses to replead his section 1981 claims against the City Defendants under section 1983.  The court therefore grants plaintiff leave to amend his complaint, but only to a limited extent.  Plaintiff may amend the complaint to assert a cause of action against the City Defendants (except for Nigro, for the reasons set forth above) under section 1983 asserting that they a "depriv[ed] [plaintiff] of [the] rights, privileges, or immunities secured by the Constitution and laws" of the United States, specifically those rights guaranteed by section 1981.

Finally, because plaintiff must sue under section 1983 to enforce the rights guaranteed by section 1981, if he wishes to obtain relief against the City, he must sufficiently allege the existence of municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny.

Plaintiff is denied leave to amend his complaint to assert a claim under section 1981's private right of action against the City Defendants.  Nothing in the two complaints plaintiff has put before the court suggests that the City Defendants' alleged actions were not under "color of state law." Therefore, the court concludes that any further effort to plead a claim under section 1981's private right of action against the City Defendants would be futile.  *See Cuoco v. Moritsugu*, 222

F.3d 99, 112 (2d Cir. 2000) (concluding that a futile request to re-plead should be denied).

## B. Section 1983 Claims

Both the City Defendants and Lemonda seek dismissal of plaintiff's section 1983 First Amendment retaliation claim. (*See* City Mem. at 13-19; Lemonda Mem. at 13-16.)  To plead a First Amendment retaliation claim under section 1983, a plaintiff must plead sufficiently "that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (internal quotation marks and citation omitted).

"When a public employee sues a government employer under the First Amendment's Speech Clause, the employee must show that he or she spoke as a citizen on a matter of public concern." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 386 (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)).  If both conditions are satisfied, the court must then "balance the First Amendment interest of the employee against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering v. Board of Ed. Of Township High School Dist. 205 Will Cty.*, 391 U.S. 563, 568 (1968)).

The analysis is the same when a government employee sues under the petition clause, as plaintiff does here: the employee must show that he petitioned as a citizen on a matter of public concern, and if he can make this showing, the court must balance the employee's First Amendment interest against the state's interest as an employer. *See Guarnieri*, 564 U.S. at 386-90 (concluding that public concern test applies to petition clause cases).

In *Lane v. Franks*, the Supreme Court noted that, in determining whether a public employee is speaking as a citizen, "[t]he critical question . . . is whether the speech at issue itself is ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." 134 S. Ct. 2369, 2379 (2014). In other words, the court must focus on the role the public employee occupied in undertaking the purportedly protected conduct, and if the conduct "'owes its existence to [the public employee's] professional responsibilities,' it is not protected by the First Amendment." *Ross v. New York City Dep't of Educ.*, 935 F. Supp. 2d 508, 516-17 (E.D.N.Y. 2013) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006) and collecting cases).

Applying this principle in *Lane*, the Supreme Court concluded that a public employee who "provide[d] truthful sworn testimony, compelled by subpoena, outside the scope of his

ordinary job responsibilities" was speaking as a citizen on a matter of public concern. 134 S.Ct at 2378. Notably, the Supreme Court expressly declined to address "whether truthful sworn testimony would constitute citizen speech under *Garcetti* when given as part of a public employee's ordinary job duties." *Id.* at 2378 n.4.

Here, plaintiff alleges that the individual defendants retaliated against him "as a result of [his] actions in exercising his rights to participate in the judicial process and to seek access to the courts" in connection with the Class Action, (Compl. ¶ 88), and that all defendants retaliated against him for accepting employment through the Class Action as a priority hire. (*Id.* ¶¶ 88, 91.) Plaintiff's purportedly protected conduct therefore "owes its existence" to his employment – or more precisely, his efforts to obtain it. It was thus undertaken in his capacity as a prospective employee seeking to become an actual employee, rather than as a citizen.

As the court has concluded, plaintiff's allegations suffice to state claims under other statutes, and plaintiff has properly sought to "avail [himself] of the 'powerful network of legislative enactments'" available to those in his position. *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008) (quoting *Garcetti*, 547 U.S. at 425). Because, however, plaintiff's alleged petitioning activity was as a prospective

employee and not as a citizen, he does not state a First
Amendment retaliation claim under section 1983, and his First
Amendment retaliation claim is dismissed.  Additionally,
plaintiff is denied leave to amend his complaint with respect to
his section 1983 First Amendment claim  because "[t]he problem
with [this] cause[] of action is substantive[,] [and] better
pleading will not cure it."  *Cuoco*, 222 F.3d at 112.

**IV.  State Tort Claims**

**A.    Intentional Infliction of Emotional Distress**

New York has adopted the definition of intentional
infliction of emotional distress set forth in the Restatement
(Second) of Torts. *Fischer v. Maloney*, 373 N.E.2d 1215, 1217
(N.Y. 1978).  "The rule is stated in the Restatement . . . as
follows: 'One who by extreme and outrageous conduct
intentionally or recklessly causes severe emotional distress to
another is subject to liability for such emotional distress.'"
*Id.* (quoting Restatement (Second) of Torts § 46(1)).

The New York Court of Appeals has articulated four
elements for an intentional infliction of emotional distress
claim: "(i) extreme and outrageous conduct; (ii) intent to
cause, or disregard of a substantial probability of causing,
severe emotional distress; (iii) a causal connection between the
conduct and injury; and (iv) severe emotional distress." *Howell
v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993) (citations

omitted).  For liability to arise, the challenged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* (citations omitted); *accord* Restatement (Second) of Torts § 46, comment d.

The City Defendants and Lemonda contend that plaintiff's claim for intentional infliction of emotional distress is time-barred, as such claims are subject to a one-year statute of limitations.  (City Mem. at 9; Lemonda Mem. at 20.)  Defendants are correct that, as an intentional tort, intentional infliction of emotional distress is subject to a one year statute of limitations.  *See Goldner v. Sullivan, Gough, Skipworth, Summers & Smith*, 482 N.Y.S.2d 606, 608 (N.Y. App. Div. 1984) (concluding that the statute of limitations set forth in N.Y. C.P.L.R. § 215(3), *i.e.* one year, applies to "the intentional tort of intentional infliction of emotional distress"); *see also Gallagher v. Directors Guild of Am., Inc.*, 533 N.Y.S.2d 863, 864 (N.Y. App. Div. 1988) ("[E]very appellate court which has considered the New York statutes at issue here has concluded that a claim for damages for an intentional tort is subject to the one-year limitations period.").

Plaintiff contends that state law tolling provisions should apply by virtue of his filing an EEOC charge, (Opp. at

17-18), but controlling Second Circuit authority states that "filing an EEOC charge does not toll the limitations period for state-law tort claims, even if those claims arise out of the same factual circumstances as the discrimination alleged in the EEOC charge." *Castagna v. Luceno*, 744 F.3d 254, 255 (2d Cir. 2014). This precedent is binding, and the case plaintiff cites in support of his position – which addresses tolling with respect to NYSHRL and NYCHRL claims, not state law torts – acknowledges as much. *See Kennedy v. Fed. Express Corp.*, No. 13-CV-1540(MAD)(ATB), 2016 WL 5415774, at *10 (N.D.N.Y. Sept. 28, 2016) ("Therefore, while *Castagna* holds that *Title VII does not toll the statute of limitations for state tort claims based on the same set of facts*, it does not necessarily follow that filing with the EEOC does not toll claims filed under the NYSHRL." (emphasis added)(citations omitted)), *aff'd in part, vacated in part, remanded*, 698 F. App'x 24 (2d Cir. 2017).

Plaintiff further contends that because of defendants' alleged ongoing retaliation, which included a threat of retaliation in September of 2016, his intentional infliction of emotional distress claim should be governed by the continuing tort doctrine and is therefore timely. (Opp. at 17.) In support of this, plaintiff cites *Shannon v. MTA Metro-North Railroad*, 704 N.Y.S.2d 208 (N.Y. App. Div. 2000). (*Id.*)

In *Shannon*, a plaintiff pleaded "detailed allegations that defendants intentionally and maliciously engaged in a pattern of harassment, intimidation, humiliation and abuse, causing him unjustified demotions, suspensions, lost pay and psychological and emotional harm over a period of years."  704 N.Y.S. 2d at 219.  The Appellate Division of the New York Supreme Court affirmed the Supreme Court's conclusion that the plaintiff could "rely on wrongful conduct occurring more than one year prior to commencement of the action, so long as the final *actionable* event occurred within one year of the suit." *Id.* (emphasis added) (citations omitted).

There appears, however, to be a split of authority among the Appellate Divisions that have addressed the applicability of the continuing tort doctrine to claims for intentional infliction of emotional distress, and *Shannon* appears to be the minority position.  *See Foley v. Mobil Chem. Co.*, 626 N.Y.S.2d 906, 907 (N.Y. App. Div. 1995) ("Plaintiff asserts that the causes of action for intentional infliction of emotional distress allege continuing wrongs and that, if any of the alleged intentional acts occurred within the period of limitations, prior acts are not time barred. We disagree. A cause of action for intentional infliction of emotional distress is limited to conduct that occurred within the one-year period immediately preceding the commencement of the action."

(citations omitted)); *Weisman v. Weisman*, 485 N.Y.S.2d 570, 570-71 (N.Y. App. Div. 1985) (concluding, where defendant asserted intentional infliction of emotional distress counterclaim based on a pattern of abusive conduct, that all claims arising more than one year prior to the commencement of the action were time-barred).

Further, even if *Shannon* is not the minority view within the New York courts, *Shannon* itself suggests that for the continuing tort violation to apply, a plaintiff must allege an independently actionable event within the limitations period. *See Shannon*, 704 N.Y.S.2d at 219 (stating that the "final *actionable* event [must have] occurred within one year of the suit" (emphasis added)); *see also Galvin v. Francis*, Nos. 5594/00, 009, 2003 WL 21696740, at *1 (N.Y. Sup. Ct. May 29, 2003) (characterizing *Foley* as "clarif[ying]" *Shannon* to require that the acts within the limitations period be "separately actionable," and noting split of authority).

The court need not resolve the apparent split of authority within the New York appellate courts because it appears that even under the more permissive *Shannon* rule, plaintiff's intentional infliction of emotional distress claim is time barred. The complaint's only allegation concerning conduct occurring within the one-year intentional tort limitations period is his allegation that, in September 30,

2016, he was informed that "FDNY was watching him and that further retaliation should be expected." (Compl. ¶ 64.) This does not rise to the level of outrageous conduct necessary to sustain a claim for intentional infliction of emotional distress, and as such is not independently actionable.

Accordingly, the City Defendants' and Lemonda's motions to dismiss plaintiff's intentional infliction of emotional distress claim as against them is granted. Further, it appears that amendment of this cause of action would be futile in light of the statute of limitations and plaintiff's failure to plead independently actionable conduct occurring within the limitations period in his initial complaint or the instant amended complaint. Plaintiff is thus denied leave to amend his complaint with respect to his intentional infliction of emotional distress claim.

## B. Negligent Infliction of Emotional Distress

Under New York law, a plaintiff may establish a negligent infliction of emotional distress under one of two theories of liability: "(1) the 'bystander' theory; or (2) the 'direct duty theory.'" *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996). The bystander theory requires that plaintiff establish "emotional injury from witnessing the death or serious bodily injury of a member of her immediate family," *id.* (citations omitted), and is accordingly inapplicable to the

instant action because the complaint does not allege any facts that, if assumed to be true, would establish this element of the cause of action.

"Under the 'direct duty' theory, a plaintiff has a cause of action for negligent infliction of emotional distress if []he suffers an emotional injury from defendant's breach of a duty which unreasonably endangered [his] own physical safety," though the duty "must be specific to the plaintiff," not a general societal one. *Id.* (citations omitted); *see also, e.g., Brown v. New York City Health & Hosps. Corp.*, 648 N.Y.S.2d 880, 885 (N.Y. App. Div. 1996) ("[T]he 'circumstances under which recovery may be had for purely emotional harm are extremely limited and, thus, a cause of action seeking such recovery must generally be premised upon a breach of a duty owed directly to the plaintiff which either endangered the plaintiff's physical safety or caused the plaintiff fear for his or her own physical safety.'" (quoting *Creed v. United Hosp.*, 600 N.Y.S.2d 151, 152 (N.Y. App. Div. 1993))).

The complaint alleges that defendants owed plaintiff a duty not to disclose his firefighter personnel or medical records under New York Civil Rights Law § 50-a, (Compl. ¶ 60), as well as "by virtue of strict limitations imposed by federal and state law and regulations on the disclosure of medical, personal and confidential information." (*Id* ¶ 101; *see also id.*

¶ 56.)  Even assuming, however, that defendants owe specific

duties to plaintiff by virtue of the relevant statutes and

regulations, the complaint does not allege that defendants'

purported breaches of these duties endangered, or caused

plaintiff to fear for, his physical safety.

Plaintiff submits that the complaint "alleges facts

suggesting that someone at Engine [Company] 257 purposefully

tampered with his oxygen tank," (Opp. at 16; Compl. ¶ 42), but

this does not suffice to state a claim for negligent infliction

of emotional distress.  Most importantly, plaintiff's allegation

regarding the oxygen tank is wholly disconnected from the duties

that plaintiff alleges defendants breached.  Further, the

complaint does not allege, in form or substance, that any of the

defendants breached any duty owed plaintiff with respect to his

oxygen tank.  Additionally, the complaint refers to "the

possible malfunctioning of, or tampering with [plaintiff]'s

oxygen tank."  (Compl. ¶ 42.)  With respect to the oxygen tank,

the complaint thus, on its own terms, merely alleges facts that

are "consistent with" liability, but also consistent with

nonactionable events and occurrences, and this does not suffice

to state a claim.  *Twombly*, 550 U.S. at 554.

Accordingly, plaintiff has not stated a claim for

negligent infliction of emotional distress against any

defendant, and that claim is dismissed.  Further, because

nothing in plaintiff's initial or amended complaints suggests that a negligent intentional infliction of emotional distress claim may be viable, the court concludes that amendment would be futile, and plaintiff is denied leave to re-plead this claim.

## V. Contempt of Court

The City Defendants and Lemonda each seek dismissal of plaintiff's tenth cause of action, which alleges contempt of two orders entered in the Class Action. (Compl. ¶¶ 103-10.) Plaintiff's complaint is not clear as to whether he seeks civil or criminal contempt. (*See id.* ¶ 110 (referring to "coercive" measures and citing the criminal contempt statute, 18 U.S.C. § 401(3)).)

"[C]ivil contempt is a facet of the original cause of action, while criminal contempt is a separate cause of action brought in the name of the United States." *Texas v. Ysleta Del Sur Pueblo*, 431 F. App'x 326, 330 (5th Cir. 2011) (quoting *Skinner v. White*, 505 F.2d 685, 689 (5th Cir. 1974)); *see also* 4 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* ("Wright & Miller"), § 1017 at 84 (4th Ed. 2015) ("Civil contempt proceedings are considered to be a part of the action that is the source of the order that is the subject of the noncompliance.").

Federal Rule of Criminal Procedure 42 governs the initiation of criminal contempt proceedings and provides that

"[t]he court," not an adverse party, "must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney." Fed. R. Crim. P. 42(a)(2); *accord Palmigiano v. Garrahy*, 448 F. Supp. 659, 673 n.4 (D. R.I. 1978) ("[T]he court, not an adverse party, may institute criminal contempt proceedings upon its own motion."). Plaintiff therefore does not, and cannot, state a claim for criminal contempt.

Additionally, because civil contempt is a "part of the action that is the source of the order that is the subject of noncompliance," Wright & Miller § 1017 at 84, it cannot be a separate, stand-alone "cause of action." *See Doe v. Harvard Univ.*, 56 F.3d 59 (1st Cir. 1995) ("Doe's allegation that Harvard was guilty of civil contempt for violating a court order issued in the prior case cannot constitute an independent cause of action." (citations omitted)); *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir. 1993) ("[T]here is no such thing as an independent cause of action for civil contempt." (quoting *Blalock v. United States*, 844 F.2d 1546, 1550 (11th Cir. 1988)).

Accordingly, plaintiff does not, and cannot, state an independent cause of action for civil contempt, and his contempt claim is dismissed. This dismissal is without prejudice to plaintiff's ability to seek a contempt finding in the Class Action under the procedures set forth in the Local Civil Rules.

*See* Local Civil Rule 83.6; *cf. also SEC v. McGinn*, No. 10-CV-457(GLS)(DRH), 2010 WL 11469813, at *4 (N.D.N.Y. Dec. 1, 2010) ("[P]roceeding by motion in seeking an order of civil contempt rather than commencing a separate proceeding constitutes the general practice in federal courts." (collecting cases)).

## Conclusion

For the reasons set forth above, the defendants' motions to dismiss are granted in part and denied in part. Specifically,

(1) The City Defendants' motion to dismiss all claims against Nigro, who is sued only in his official capacity, is GRANTED. As set forth above, because plaintiff has had the opportunity to plead a claim against Nigro in his individual capacity but has twice chosen not to do so, he is not granted leave to amend the complaint with respect to its claims against Nigro.

(2) Lemonda's motion to dismiss plaintiff's NYSHRL and NYCHRL claims against him is DENIED.

(3) The City Defendants' motion to dismiss plaintiff's Title VII claims arising prior to April 9, 2015 is GRANTED to the extent that plaintiff cannot recover under Title VII for discrete acts about which he became aware prior to that date. However, plaintiff may rely on events occurring prior to April 9, 2015 in (a) seeking to

establish the causation element of his Title VII, NYSHRL, and NYCHRL retaliation claims and (b) seeking to establish his retaliatory hostile work environment claim, which the court concludes he has sufficiently pleaded.

(4) The City Defendants' motion to dismiss plaintiff's section 1981 claim against them as non-state actors is GRANTED. Plaintiff is granted leave to re-plead his section 1981 claim against the City Defendants (with the exception of Nigro), as state actors pursuant to section 1983, alleging violation of plaintiff's rights as protected by section 1981.

(5) Lemonda's motion to dismiss plaintiff's section 1981 claim against him is DENIED.

(6) The City Defendants' and Lemonda's motions to dismiss plaintiff's section 1983 First Amendment retaliation claim are GRANTED.

(7) The City Defendants' and Lemonda's motions to dismiss plaintiff's intentional infliction of emotional distress and negligent infliction of emotional distress claims are GRANTED.

(8) The City Defendants' and Lemonda's motions to dismiss plaintiff's contempt claim are GRANTED, without prejudice to plaintiff's ability to seek a contempt finding in the Class Action.

Except as provided in (4) above, plaintiff may not re-plead any dismissed claim.  Plaintiff shall file his amended complaint within thirty (30) days.  The parties are directed to confer and jointly advise the court as to how they intend to proceed no later than April 9, 2018.

**SO ORDERED.**

Dated:     March 31, 2018
           Brooklyn, New York

                          _____/s/_____
                          Hon. Kiyo A. Matsumoto
                          United States District Judge