UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
MICHAEL JOHNSON,

     *Plaintiff*,

-against-

THE CITY OF NEW YORK, DANIEL A.
NIGRO, MICHAEL GALA, MICHAEL
CURNEEN, JAKE LAMONDA, AND JOHN JOE
OR JANE DOE,

     *Defendants*.
----------------------------------X

**MEMORANDUM & ORDER**

16-CV-6426(KAM)(VMS)

**MATSUMOTO, United States District Judge:**

     On November 18, 2016, Michael Johnson ("Plaintiff")
commenced this action, alleging violations of his constitutional
and civil rights in connection with alleged workplace
retaliation and alleged wrongful disclosure of his protected
personal information, which resulted in derogatory media
articles about plaintiff.  (ECF No. 1, Complaint.)  On March 31,
2018, the court granted in part and denied in part defendant,
Jake Lemonda's motion to dismiss, and granted the City
Defendants' motion to dismiss.  (ECF No. 82, Order Granting in
Part and Denying in Part Lemonda's Motion to Dismiss and
Granting the City Defendants' Motion to Dismiss.)

     On October 31, 2018, plaintiff filed a third amended
complaint alleging violations of his constitution and civil
rights and unlawful retaliation, pursuant to Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII")

against the City of New York.  Plaintiff also alleges unlawful
retaliation claims against all defendants pursuant to the New
York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.*
("NYSHRL") and the New York City Human Rights Law ("NYCHRL"),
New York City Administrative Code § 8-107, *et seq.*, as amended.
(*See generally* ECF No. 115, Third Amended Complaint.)  Plaintiff
additionally brings discrimination and retaliation claims
pursuant to 42 U.S.C. §§ 1981 and 1983 against Michael Curneen,
Michael Gala, Jake Lemonda, Paul Mannix, and Joseph Kearney.
Separately, plaintiff alleges municipal liability against the
City of New York, and a conspiracy claim against the defendants
pursuant to 42 U.S.C. §§ 1985(3) and 1983.  (*See id.*)

          Presently before the court are the summary judgment
motions of the City of New York, Michael Curneen and Michael
Gala (collectively, the "City Defendants"); Joseph Kearney and
Paul Mannix (collectively, the "Individual Defendants"); and
Jake Lemonda.  (ECF No. 165, Motion for Summary Judgment by the
City of New York; ECF No. 171, Motion for Summary Judgment by
Jake Lemonda; ECF No. 175, Motion for Summary Judgment by Joseph
Kearney and Paul Mannix.)  Plaintiff opposes the motions.  (ECF
No. 179, Plaintiff's Memorandum in Opposition to Summary
Judgment Motions by all Defendants ("Pl. Mem.").)  For the
reasons provided below, the court grants in part and denies in
part the defendants' motions for summary judgment.

**BACKGROUND**

I.    **Factual Background**

The following timeline of events is taken from the parties' filings pursuant to Local Civil Rule 56.1.[12]  (*See* ECF No. 166, City's Rule 56.1 Statement of Undisputed Material Facts ("City's 56.1 Stm't."); ECF No. 172, Lemonda's Rule 56.1 Statement of Undisputed Material Facts ("Lemonda's 56.1 Stm't."); ECF No. 176, Kearney and Mannix's Rule 56.1 Statement of Undisputed Material Facts ("Kearney and Mannix 56.1 Stm't."); and ECF No. 180, Plaintiff's Objections to Defendants' 56.1 Statements ("Pl. 56.1 Stm't.").)  The Court has considered whether the parties have proffered admissible evidence in support of their purported undisputed or disputed facts and has viewed the facts in a light most favorable to plaintiff.  Disputed issues of fact are noted.

---

[1]    Local Civil Rule 56.1 provides that a party moving for summary judgment "shall annex[] to the notice of motion a separate, short and concise statement . . . of the material facts to which the moving party contends there is no genuine issue to be tried." L. Civ. R. 56.1(a).  The party opposing the motion must "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party" with the opposition. Local Civ. R. 56.1(b).  Each of these paragraphs must cite to admissible evidence.  L. Civ. R. 56.1(c).  Facts supported by admissible evidence that were not contradicted by citations to admissible evidence are deemed admitted.  *See Ferraro v. New York City Dep't of Educ.,* 404 F. Supp. 3d 691, 698 (E.D.N.Y. 2017), *aff'd,* 752 F. App'x 70 (2d Cir. 2018).

[2] The defendants each submitted 56.1 statements, (*see* ECF Nos. 166, 172, and 176,), and the plaintiff continued the sequencing of each of the defendants' 56.1 statements in plaintiff's responsive statement.  (*See* ECF No. 180.)  Unless otherwise noted, the Local Rule 56.1 Statement of Undisputed Facts cited herein refers to Plaintiff's Combined Rule 56.1 Responsive Statement, which contains Plaintiff's responses to Defendants' Local Rule 56.1 Statements of Undisputed Facts.  (*See id.*)

## A. Parties

Michael Johnson is a black firefighter who was employed by the New York City Fire Department ("FDNY") since 1999. (Pl. 56.1 Stm't. Response to City ¶ 1; Response to Mannix and Kearney ¶ 1; and Response to Lemonda ¶ 1.) After graduating from the Fire Fighter Academy ("the Academy"), plaintiff was stationed at Engine 257, under the supervision of Defendants, Michael Curneen, Captain of Engine Company 257, and Michael Gala, Chief of Uniformed Personnel of the FDNY. (Pl. 56.1 Stm't. Response to Mannix and Kearney ¶ 3.) Jake Lemonda had been a firefighter and had a supervisory civil service title, but worked as the President of the Uniformed Fire Officers Association (the "UFOA"). (Pl. 56.1 Stm't. Response to Mannix and Kearney ¶ 4; Response to Lemonda ¶¶ 46, 49.) The UFOA is a municipal labor union which represents uniformed employees of the FDNY with supervisory capacities, but does not represent firefighters. (Pl. 56.1 Stm't. Response to Lemonda ¶ 47.) Defendants, Paul Mannix, a Deputy Battalion Chief, and firefighter Joseph Kearney, were also employed by the FDNY at the time Plaintiff was stationed at Engine 257. (Pl. 56.1 Stm't. Response to Mannix and Kearney ¶ 5-6.) From 2010 through 2014, Paul Mannix was the President of Merit Matters, an organization which defendants contend "was dedicated to preserving the salutary benefits of the merit system and

4

retaining high standards within the FDNY."[3]   (Pl. 56.1 Stm't.
Response to Mannix and Kearney ¶¶ 22-26.)   Joseph Kearney served
as the organization's Vice President.   (Pl. 56.1 Stm't. Response
to Mannix and Kearney ¶ 27.)

### B. Plaintiff's Employment History

Plaintiff was first hired in 1999 to work in the
FDNY's Emergency Medical Services division as an Emergency
Medical Technician ("EMT").   (Pl. 56.1 Stm't. Response to City ¶
3; Response to Mannix and Kearney ¶ 42; Response to Lemonda ¶
1.)   In 2013, plaintiff entered the Academy as a probationary
firefighter.   (Pl. 56.1 Stm't. Response to City ¶ 3; Response to
Mannix and Kearney ¶ 43; Response to Lemonda ¶ 2.)   After
completing the Academy in 2014, plaintiff was assigned to Engine
Company 257 in Canarsie, Brooklyn as a 41-year-old firefighter.
(Pl. 56.1 Stm't. Response to City ¶¶ 3,7; Response to Mannix and
Kearney ¶ 45; Response to Lemonda ¶ 6.)   Defendants assert that
"no one at Engine 257 ever referred to him [the plaintiff] as a
'priority hire.'"[4]   (Pl. 56.1 Stm't. Response to City ¶ 7.)

---

[3] Plaintiff disputes the defendants' characterization of Merit Matters as
argumentative rather than a proper factual statement.   (Pl. 56.1 Stm't.
Response to Mannix and Kearney ¶¶ 22-26.)

[4] As discussed in this court's March 31, 2018 Order, plaintiff was appointed
as a "priority hire" following the court order entered by the Honorable
Nicholas G. Garaufis in the case captioned *United States, et. al v. City of
New York*, No. 07-CV-2067(NGG) (E.D.N.Y.) (the "Vulcan Class Action").   (*See*
ECF No. 82, Order Granting in Part and Denying in Part Lemonda's Motion to
Dismiss and Granting the City Defendants' Motion to Dismiss.)   Plaintiff has
since testified that he was not a party to the Vulcan Class Action, but
participated in and benefited from the remedial orders in the Vulcan Class
Action lawsuit.   (Pl. 56.1 Stm't. Response to City ¶ 2.)

Plaintiff clarifies that when he arrived at Engine 257, no one referred to him as a priority hire, although comments were made about his 41-year age at the time, indicating knowledge that he was a priority hire.  Specifically, the record indicates that Curneen understood plaintiff to be a "priority hire" because of his age.  (*See id.*; ECF No. 164-3, at 167.)

Plaintiff testified that as a probationary firefighter at Engine 257, he individually drilled and practiced by himself putting on personal protective equipment.  (Pl. 56.1 Stm't. Response to City ¶ 12, 13.)  At Engine 257, while a probationary employee, Johnson would start every tour with a drill and end every tour with a drill as directed by Curneen and other supervisors.  (Pl. 56.1 Stm't. Response to City ¶ 12; ECF No. 182-41, Exhibit.)  All probationary officers practiced their drills, but out of the seven probationary officers at the time, Captain Curneen stated only Johnson's abilities to perform the drills gave him concerns.[5]  (Pl. 56.1 Stm't. Response to City ¶ 19; ECF No. 164-3, Exhibit BIT transcript at 23-24.)  In plaintiff's first performance evaluation, "plaintiff was noted to have deficiencies in donning PPE properly and performing duties at [the] fire." (Pl. 56.1 Stm't. Response to City ¶ 27.)  Captain Curneen recommended that plaintiff be re-trained at the

_____

[5] Plaintiff objects that other probationary employees' performances were not produced and should not be considered.  (Pl. 56.1 Stm't. Response to City ¶ 20.)

Academy. (*Id*.)  Plaintiff disputes Curneen's assessment of plaintiff and asserts that his evaluations were false, retaliatory, and pretextual.  (*Id*.)

On July 4, 2014, while a probationary officer at Engine 257, plaintiff was injured on the job.  (Pl. 56.1 Stm't. Response to City ¶ 33.)  Consequently, plaintiff was on medical leave for 226 days and returned to his post on February 2, 2015. (Pl. 56.1 Stm't. Response to City ¶ 38.)  Plaintiff's probationary period was extended due to his "excessive medical leave."  (Pl. 56.1 Stm't. Response to City ¶ 41.)

### C. The April 2, 2015 Fire and Aftermath

On April 2, 2015, two months after plaintiff had returned from medical leave on February 2, 2015, Engine 257 was called to respond to a fire. (Pl. 56.1 Stm't. Response to City ¶ 42.)  Plaintiff was assigned to the position of "back-up."  (Pl. 56.1 Stm't. Response to City ¶ 44.)  After ten minutes at his post, plaintiff left the hose line because his oxygen was low and went back to the firetruck to replace his air tank.  (Pl. 56.1 Stm't. Response to City ¶ 45.)  During the period after he left the hose line, Captain Curneen called over the radio saying that he could not find his "back-up."  (Pl. 56.1 Stm't. Response to City ¶ 47.)  Plaintiff responded over the radio and informed Captain Curneen that he was replacing the air in his tank.  (Pl. 56.1 Stm't. Response to City ¶ 48.)  Plaintiff also testified

that when he returned to the burning building after replacing the air in his tank, Curneen told plaintiff to return to the rig.  (Pl. 56.1 Stm't. Response to City ¶ 63; ECF No. 170-1 at 115-116.)

Gala was also at the fire on April 2, 2015.  (Pl. 56.1 Stm't. Response to City ¶ 105; ECF No. 164-4, Exhibit at 19.) Gala testified that his typical practice is to "snap a couple of pictures and send them off to the fire commissioner."  (ECF No. 164-4, Exhibit at 22.)  Gala further testified that he saw Johnson the day of the fire and that no one spoke to him about Johnson's whereabouts during the fire.  (ECF No. 164-4, Exhibit at 21.)  In fact, Gala passed by the rig where plaintiff was and asked plaintiff, "How are you doing?" to which plaintiff replied, "okay."  (*Id.* at ¶ 49.)

After returning to Engine 257, Captain Curneen spoke with Johnson privately and stated "I don't know what I'm going to do with you.  I might just have to keep you on the, the back step."  (Pl. 56.1 Stm't. Response to City ¶ 50; ECF No. 170-1, Appx. A at 120.)  Curneen also testified that he told plaintiff, "maybe this job is not for him."  (*Id.*)  No one at Engine 257 spoke to plaintiff for the rest of his shift after they returned to the firehouse.  (Pl. 56.1 Stm't. Response to City ¶ 52.) Later that same day, Gala requested information about Johnson and received information regarding Johnson's status as a

8

priority hire.  (Pl. 56.1 Stm't. Response to City ¶ 105; ECF Nos. 182-44, 45, and 48.)

On April 3, 2015, Engine 257 responded to another call. (Pl. 56.1 Stm't. Response to City ¶ 55.)  Plaintiff testified that someone "tangled" his suspenders with his boots so he was unable to timely put on his gear, which resulted in him being unable to join the other officers in responding call. (Pl. 56.1 Stm't. Response to City ¶ 56; ECF No. 170-1, Appx. A at 125, 7-9.)  That same day, plaintiff reported abdominal pain and took medical leave and his doctor prescribed medication for a virus.  (Pl. 56.1 Stm't. Response to City ¶¶ 59, 61.)

On April 7, 2015, five days after the April 2, 2015 incident, Captain Curneen emailed Dr. Kevin Kelly, the FDNY Chief Medical Officer, and requested that plaintiff receive a complete medical evaluation.  (Pl. 56.1 Stm't. Response to City ¶¶ 62, 63.)  Curneen conveyed to Dr. Kelly that he wanted Johnson to undergo a psychological evaluation.  (*Id.*)  During his psychological evaluation with Dr. Kelly on April 8, 2015, Johnson reported that he thought the firefighters at Engine 257 were "mad at him" because of his performance at the April 2, 2015 fire, and stated that he did not think there were racial issues, but that he was being subjected to a hostile work environment and abusive treatment.  (Pl. 56.1 Stm't. Response to City ¶¶ 66-67.)  In plaintiff's declaration, he states that he

told Dr. Kelly that he did not think there was a racial issue because he "believed that by interjecting race into the problems [he] was having at the firehouse would likely lead to more abuse, hostility and resentment." (ECF No. 181, Johnson Affidavit at ¶ 5.)

After the two fires, Curneen emailed Gala regarding Johnson. (ECF No. 182-9, Exhibit.) On April 10, 2015, Curneen attached a report regarding Johnson's performance at the two fires and titled the email subject line "Probationary Firefighter Michael Johnson." (*Id.*) Curneen's email described Curneen's concerns about Johnson's performance at the fires and his inability to master his drills. (*Id.*) Specifically, Curneen stated in his report that he was "greatly concerned that his [Johnson's] actions [would] contribute to an injury on the fire ground to either himself or another firefighter." (*Id.*)

D. **The May 17, 2015 *New York Post* Article and Aftermath**

On May 17, 2015, the *New York Post* published an article titled, "Firefighters Fear Colleague Who Routinely Flees Fires," listing the authors as Susan Edelman and Amber Jamison. (Pl. 56.1 Stm't. Response to Mannix and Kearney ¶ 73.) The article featured a photograph purportedly depicting plaintiff at the April 2, 2015 fire and described plaintiff's behavior the day of the April 2, 2015 fire based on anonymous FDNY sources. (Pl. 56.1 Stm't. Response to Mannix and Kearney ¶¶ 73-75.) The

article also states that Johnson is a priority hire and asserts that according to sources, plaintiff had "managed to evade the smoke and flames" several times since his hiring.  (ECF No. 182-26, Exhibit.)  Similar to the language in Curneen's April 10th report regarding plaintiff at the April 2nd fire, the article quotes a source familiar with Engine 257's need to correct plaintiff's "intentionally avoiding danger," as stating that a civilian or firefighter "will be injured or killed."  (*Id*; see *also* ECF No. 182-9, Exhibit.)  The article also refers to a letter that a chief sent to the Brooklyn division regarding concerns about Johnson at the April 2nd fire, Johnson's subsequent retraining, his desire not to return to Engine 257, and his medical leaves.  (*Id*.)  The article quotes three unnamed FDNY sources.  (*Id*.)  Defendant Lemonda admitted speaking to the *Post* about the article before it was published.  (Pl. 56.1 Stm't. Response to Mannix and Kearney ¶¶ 76-77.)  Plaintiff also points to "substantial evidence" that the individual defendants were directly and indirectly involved in disclosing information about plaintiff to the *Post*.  (Pl. 56.1 Stm't. Response to Mannix and Kearney ¶ 79.)

On May 15, 2015, two days before the *Post* article was published, the FDNY Director of Public Relations, James Long, circulated an email that he was notified "by B58/E257/L170" that the *New York Post* was planning on writing an article referencing

the plaintiff.  (Pl. 56.1 Stm't. Response to Mannix and Kearney
¶ 83-84.)  Curneen and James Long contacted plaintiff before the
*Post* article was published to let him know that the article was
going to be published.  (Pl. 56.1 Stm't. Response to Mannix and
Kearney ¶ 86-87.)

On May 15, 2015, Mannix and Kearney spoke on the phone
for approximately twenty minutes.  (Pl. 56.1 Stm't. Response to
Mannix and Kearney ¶ 88-89.)  During their conversation, the
Individual Defendants assert that they spoke about Mannix's
disciplinary proceedings and how there might be further
investigation into other members of Merit Matters.  (Pl. 56.1
Stm't. Response to Mannix and Kearney ¶¶ 90-91.)  After their
conversation, Kearney called Lemonda to purportedly inquire
about Mannix's disciplinary proceedings and whether the
investigation would extend beyond Mannix, to which Lemonda
explained that the investigation would not go further than
Mannix.  (Pl. 56.1 Stm't. Response to Mannix and Kearney ¶¶ 92-
92.)  Plaintiff disputes the truth of Mannix's and Kearney's
exculpatory story and cites evidence that Kearney obtained
Lemonda's number and called Lemonda, but had no reason to speak
with Lemonda about Mannix's pending disciplinary case, because
Lemonda did not handle Mannix's disciplinary case and would not
handle investigations regarding firefighters like Kearney.  (*See*
Pl. Opp. at 52-53 and cited evidence; ECF No. 170-5, Exhibit E

12

at 95-101; ECF No. 170-8, Exhibit F at 78-79; 96-98.)  Moreover, Lemonda had no work-related interactions with Kearney since 1994 and had not spoken to him for at least five years.  (*Id.*)  Plaintiff's evidence creates an issue of fact whether Kearney, Mannix, and Lemonda "generated a false narrative . . . to cover up . . . their illicit agreement" to act together in leaking inflammatory information to the media in furtherance of their objective to discredit the Vulcan Class Action.  (*See* Pl. Opp. at 51-52.)  Mannix was disciplined in separate proceedings for the unauthorized disclosure of confidential information.  (*Id.* at 53.)

In response to the *New York Post* article, the FDNY Bureau of Investigations and Trials ("BIT") interviewed members of the FDNY, but not defendant Mannix or anyone connected with Merit Matters, reviewed email accounts, reviewed social media accounts, and studied transmissions, logbooks, and rosters, to determine who had provided the *New York Post* with the information in the article.  (Pl. 56.1 Stm't. Response to City ¶¶ 86-87.)  Upon concluding the investigation, the BIT could not substantiate whether Curneen may have been involved in providing information to the *New York Post*. (Pl. 56.1 Stm't. Response to City ¶¶ 91-92.)

Plaintiff contends that he has "marshalled substantial evidence that each of the individual defendants were directly or

indirectly involved" in leaks about plaintiff to the *Post*.  (*See* Pl. 56.1 Stm't. Response to Mannix and Kearney ¶ 79.)  Both the City Defendants and Individual Defendants, however, assert that they did not speak with the *New York Post*.  (Pl. 56.1 Stm't. Response to City ¶¶ 101-105; Response to Mannix and Kearney ¶ 97.)  Plaintiff disputes the "self-serving denials," and cites Curneen's knowledge of the article before it was published and notes that he called plaintiff and said he had "nothing to do with it."  (*Id*.)  Lemonda testified that he received a call from a *New York Post* reporter several days before the article was to be published, inquiring about "a firefighter who has problems," and the April 2nd fire.  (*See* Pl. 56.1 Stm't. Response to Lemonda ¶ 57.)  Lemonda asserts that he told the reporter that he was not at the fire and did not know anything about the incident involving the plaintiff.  (*Id*. ¶¶ 57-59.)  Plaintiff correctly notes that the court does not make credibility determinations in deciding summary judgment motions, and cites evidence that there were at least four calls between Lemonda and the *Post* reporter for 50 minutes.  (*Id*. ¶ 58.)  Mannix and Kearney assert that they "were not sources, nor did they provide or have access to information used in the article." (*See* Pl. 56.1 Stm't. Response to Mannix and Kearney ¶ 77.)  Plaintiff counters that even if Mannix and Kearney were not quoted in the article, the evidence shows that Lemonda spoke to Kearney and Mannix and the *Post*

14

reporter several days before the article was published.  (Pl.
Opp. at 52-54) (citing ECF No. 170-8, Exhibit F at 72, 23, 94-
99.)  Plaintiff asserts that disputes of material fact as to
defendants' participation in leaking plaintiff's confidential
information are established by the evidence cited in his 56.1
Statement and Opposition Memorandum.

## II.   Procedural History

        The March 31, 2018 Memorandum and Order sets forth
this case's procedural history in detail up to the date of that
decision denying defendants' motion to dismiss the amended
complaint, that procedural history is incorporated by reference
herein.  (ECF No. 82, Order.)  As such, this court will review
in this section the procedural history post the March 31, 2018
Memorandum and Order.

        Shortly after this court's Memorandum and Order, the
parties engaged in discovery proceedings.  (*See* ECF No. 86,
Motion for Discovery; ECF No. 98, Scheduling Order; Dkt. Order
8/17/2018.)  Plaintiff also filed a second amended complaint on
April 30, 2018.  (ECF No. 87, Amended Complaint.)  On August 22,
2018, this court granted plaintiff leave to move to file a third
amended complaint.  (Dkt. Order 8/22/2018.)  This court granted
plaintiff's motion to file a third amended complaint on October
24, 2018.  (ECF No. 113, Order Granting Motion for Leave to File
Amended Complaint.)  Plaintiff filed his third amended complaint

on October 31, 2018.  (ECF No. 115, Third Amended Complaint.)
The Third Amended Complaint brought claims against Michael Gala,
Michael Curneen, Jake Lemonda, Paul Mannix, Joseph Kearney,
James McCarthy, John and/or Jane Does, and the City of New York.
(*See Id.*)  On May 6, 2019, the court ordered that James McCarthy
be dismissed with prejudice.  (ECF No. 139, Order Dismissing
McCarthy.)

On September 4, 2019, this court held a pre-motion
conference to discuss defendants' anticipated motions for
summary judgment.  (Minute Entry for 9/4/2019 proceedings.)  At
the conference, the parties were amenable to mediation.  (*Id.*)
The Court set forth a briefing schedule and ordered that if the
parties wished to delay briefings in light of the mediation,
they should inform the court.  (*Id.*)  On September 24, 2019,
Joseph Kevin McKay was selected as a mediator.  (Selection of
Mediator, 9/24/2019.)  On October 25, 2019, the mediation
concluded and the case was not settled.  (Report, 10/25/2019.)

On March 18, 2020, the City Defendants filed a motion
for summary judgment along with their Rule 56.1 Statement,
accompanying affidavits, Memorandum in Support of their Motion,
their reply in support of the motion, and a joint deposition
appendix to the accompanying affidavits.  (*See* ECF No. 165,
Motion for Summary Judgment; ECF No. 166, City Defendants Rule
56.1 Statement; ECF No. 167, City Defendants'

Affidavit/Declaration; ECF No. 168, Memorandum in Support of
Motion for Summary Judgment; ECF No. 169, City Defendants'
Reply; and ECF No. 170, Joint Deposition Appendix.)  On March
19, 2020, Jake Lemonda filed his motion for summary judgment,
his Rule 56.1 Statement, his affidavit in support of the motion,
his Memorandum in Support of the Motion, and a Reply in Support
of the Motion.  (*See* ECF No. 171, Motion for Summary Judgment;
ECF No. 172, Lemonda's Rule 56.1 Statement; ECF No. 173,
Lemonda's Affidavit/Declaration; ECF No. 174, Memorandum in
Support of the Motion; ECF No. 184, Lemonda's Reply.)  Also on
March 19, 2020, the Individual Defendants, Mannix and Kearney,
filed their motion for summary judgment, their 56.1 statement,
their affidavits in support of their motion, their Memorandum in
Support of their Motion, and their Reply in support of the
Motion.  (*See* ECF No. 175, Motion for Summary Judgment; ECF No.
176, Mannix and Kearney 56.1 Statement; ECF No. 177, Mannix and
Kearney Affidavit/Declarations; ECF No. 178, Memorandum in
Support of the Motion; ECF No. 183, Mannix and Kearney Reply.)

    Johnson filed a Memorandum in Opposition to all of the
Summary Judgment Motions, an opposing response to all of
defendants' 56.1 statements, and accompanying affidavits or
declarations, and exhibits in opposition.  (ECF No. 179,
Memorandum in Opposition; ECF No. 180, Plaintiff Rule 56.1
Statement; ECF No. 181, Affidavit in Opposition; and ECF No.

182, Affidavit in Opposition.)  On March 27, 2020, Johnson filed a motion for leave to file a "short, five-page sur reply in connection with three points raised by the City Defendants in their reply."  (ECF No. 190, Motion for Leave to File.)  This court granted plaintiff's motion on March 31, 2020.  (Dkt. Order 3/31/2020.)  Plaintiff filed his *sur-reply* on April 7, 2020.  (ECF No. 192, Memorandum in Opposition Re *Sur Reply*.)  The City Defendants filed a reply to plaintiff's *sur-reply* on April 14, 2020.  (ECF No. 195, Reply in Response to Plaintiff's *Sur-Reply*.)

## **LEGAL STANDARD**

Summary judgment shall be granted to a movant who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'"  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).  No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

When bringing a motion for summary judgment, the movant carries the burden of demonstrating the absence of any disputed issues of material fact and entitlement to judgment as a matter of law.  *Rojas*, 660 F.3d at 104.  In deciding a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A moving party may indicate the absence of a factual dispute by "showing . . . that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  Put another way, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Ind. Co.*, 475 U.S. at 587.

Once the moving party has met its burden, "the nonmoving party may not rest upon mere conclusory allegations or denials."  *Castro v. Cty. of Nassau*, 739 F. Supp. 2d 153, 165 (E.D.N.Y. 2010) (citing *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984)).  Rather, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-

23 (1986)).  In deciding a motion for summary judgment, the court is dutybound not to weigh evidence or assess the credibility of witnesses.  *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994).

       "Employment discrimination cases raise special issues on summary judgment."  *Kenney v. New York City Dep't of Educ*., No. 06-cv-5770, 2007 U.S. Dist. LEXIS 77926, at *7 (S.D.N.Y. Oct. 22, 2007).  Specifically, employment discrimination cases that involve a dispute concerning the "employer's intent and motivation" may not be suitable for summary judgment. *Id.; see also Holcomb v. Iona Coll*., 521 F.3d 130, 137 (2d Cir. 2008). The Second Circuit has noted, however, that it "went out of [its] way to remind district courts that the impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable."  *Weinstock v. Columbia Univ*., 224 F.3d 33, 41 (2d Cir. 2000) (quotation omitted); *see also Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 148 (2000) ("trial courts should not 'treat discrimination differently from other ultimate questions of fact'") (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)); *Holcomb*, 521 F.3d at 137 ("Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").

**DISCUSSION**

I.   **Plaintiff's Retaliation Claim under Title VII, State Law, and Local Law**

As noted above, the complaint asserts retaliation claims against all defendants pursuant to Title VII, the New York State, and New York City Human Rights Laws against all defendants.  In this court's March 31, 2018 Order, the court granted the City Defendants' motion to dismiss plaintiff's Title VII claim arising out of events that occurred prior to April 9, 2015 because the continuing violation doctrine exception did not apply to "discrete acts."  (*See* ECF No. 82, Order at 37-40.) The court also ruled that "plaintiff may, however, rely on events occurring prior to April 9, 2015 in (a) seeking to establish the causation element of his Title VII, NYSHRL, and NYCHRL retaliation claims and (b) seeking to establish his retaliatory hostile work environment claim."  This Court denied Lemonda's motion to dismiss as to plaintiff's retaliation claims under NYSHRL and NYCHRL because Johnson had sufficiently pled that Lemonda was involved in, or aided and abetted, the alleged retaliation.  (ECF No. 82, Order at 32-36.)

A. **Legal Standard**

The federal anti-retaliation statute "seeks to secure th[e] primary objective [of] preventing an employer from interfering (through retaliation) with an employee's efforts to

21

secure or advance enforcement of [Title VII's] basic
guarantees." *Burlington N. & Santa Fe Ry. Co. v. White,* 548
U.S. 53, 63 (2006).  As with discrimination claims, federal and
state retaliation claims are governed by the *McDonnell Douglas*
framework.  *Zann Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 843 (2d
Cir. 2013).

  To establish a *prima facie* case of retaliation under
federal and state law, a plaintiff must show (1) participation
in a protected activity, (2) the defendant's knowledge of the
protected activity, (3) an adverse employment action, and (4) a
causal connection between the protected activity and the adverse
employment action.  *Id.* at 844.  Once the plaintiff makes a
*prima facie* showing, the burden shifts to the employer to
articulate a legitimate, non-retaliatory reason for the
employment action.  *Id.* at 845 (citing *United States v. Brennan,*
650 F.3d 65, 93 (2d Cir. 2011)).  After a non-retaliatory reason
has been articulated, the presumption of retaliation drops, and
the plaintiff must then demonstrate the non-retaliatory reason
is a mere pretext for retaliation.  *Id.*

  A plaintiff "alleging retaliation in violation of
Title VII must show that retaliation was a 'but-for' cause of
the adverse action, and not simply a 'substantial' or
'motivating' factor in the employer's decision." *Id.* (citing
*Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 360

(2013)).  This does not require proof that retaliation was the only cause for the employer's action, but that the adverse action would not have occurred absent the retaliatory motive. *Id.* at 846.  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  *Id.*

With respect to retaliation claims, courts consider a broader range of conduct than they do for discrimination claims. Unlike the discrimination provision, the anti-retaliation provision of Title VII is not limited to discriminatory actions that affect the terms and conditions of employment.  *Burlington,* 548 U.S. at 63.  Courts properly assess "whether the actions of an employer could dissuade a reasonable worker from making a charge of discrimination."  *Conforti v. Sunbelt Rentals, Inc.,* 201 F. Supp. 3d 278, 302 (E.D.N.Y. 2016).

"The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a *prima facie* case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [the plaintiff]'s burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 933 (2d Cir. 2010).  "[E]mployer actions prohibited by Title VII's anti-

discrimination provision are limited to conduct that affects the terms and conditions of employment, while under Title VII's anti-retaliation provision, the challenged action need not affect the terms and condition of employment in order to constitute unlawful retaliation." *Siddiqi v. New York City Health & Hosps. Corp.,* 572 F. Supp. 2d 353, 372 (S.D.N.Y. 2008) (citing *Burlington,* 548 U.S. at 63-64).

"The NYSHRL allows for individual liability under two theories: (1) if the defendant has an ownership interest in the employer or has the authority to hire and fire employees, and (2) if the defendant was aiding and abetting the unlawful discriminatory acts of others." *Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11-CV-5528(MKB), 2014 WL 4773975, at *34 (E.D.N.Y. Sept. 24, 2014) (internal citations and quotation marks omitted) (citing N.Y. Exec. L. § 296(1)-(2), (6)); *see also* N.Y. Exec. L. § 296(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.").

The "NYCHRL's retaliation provision is broader than Title VII's[,] protecting plaintiffs who 'oppos[e] any practice forbidden under' the law from conduct 'reasonably likely to deter a person engaging in such action.'" *Id*. at 76 (citing *Mihalik*, 715 F.3d at 112). "While the NYCHRL has a less

demanding standard [for retaliation], a plaintiff still must establish that there was a causal connection between [his] protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for [its action] was pretextual or motivated at least in part by an impermissible motive." *Hughes v. Twenty-First Century Fox,* Inc., 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018) (quotation omitted).

### B. *Prima Facie* Claim of Retaliation

Plaintiff argues that he is "simply the latest victim of the FDNY backlash against those who seek to assert their civil rights" and that the retaliation against him "began immediately upon his appointment at Engine 257 as a 'priority hire,'" under the Vulcan Class Action, and "it never really stopped." (ECF No. 179, Memorandum in Opposition ("Pl. Opp.") at 7.)

In this Court's March 31, 2018 order, the court determined that plaintiff had engaged in protected activity because he participated in the Vulcan Class Action, which challenged unlawful employment discrimination, and the plaintiff accepted appointment as a firefighter pursuant to the remedial order entered in that case. (*See* ECF No. 82, Order at 29-30.) Based on plaintiff's testimony that he was not a plaintiff in the Vulcan Class Action Lawsuit, (Pl. 56.1 Stm't. Response to City ¶ 2), the City Defendants and Lemonda argue that

plaintiff's beneficiary status as a "priority hire" does not
constitute a protected activity.  (See ECF No. 168, City
Defendants' Memorandum at 3; ECF No. 174, Lemonda's Memorandum
at 5.)  Plaintiff, however, testified that he "participated in
and benefited from the remedial orders in the Vulcan lawsuit."
(Pl. 56.1 Stm't. Response to City ¶ 2; ECF No. 170-1 at 16-17.)
Therefore, because plaintiff assisted with the Vulcan Class
Action by providing a deposition, and separately benefited from
the lawsuit as a priority hire, plaintiff's actions constitute
protected conduct.  *See* N.Y. Exec. Law § 296(1)(e), (3-a)(c),
and (7) (each providing that "oppos[ing] any practices forbidden
under this article or . . . fil[ing] a complaint, testif[ying]
or assist[ing] in any proceeding under this article" constitute
protected conduct).

As to whether defendants had knowledge of plaintiff's
protected conduct, the City Defendants and Lemonda argue that
"the record is devoid of any evidence that the anonymous source
who allegedly disclosed plaintiff's stress-related medical leave
status [to the *New York Post*] was aware of plaintiff's status as
a 'priority hire.'" (ECF No. 168, City Defendants' Memorandum at
3; *see also* ECF No. 174, Lemonda's Memorandum at 5.)  The *New
York Post* article, however, cites numerous unnamed FDNY sources
and "insiders" and described plaintiff as a black priority hire
and a "probie," who took two medical leaves, and was retrained

26

at the Academy,(ECF No. 182-26), information that the reporter could only have obtained from the FDNY.  Plaintiff, further contends that "several members of his firehouse made comments to Johnson about his age" and that "Curneen [] agreed that Johnson's age was a basis for believing that Johnson was a priority hire."  (Pl. Opp. at 42; ECF No. 164-3, Exhibit at 167.)  Moreover, the Fire Department and City were aware that plaintiff was a priority hire, given the Vulcan Class Action orders.  Defendant Gala received a list of Black and Hispanic firefighters from Human Resources with plaintiff's name on April 2, 2015, and emails on April 3, 2015 with Gloria Aiken of the FDNY tenure desk that noted plaintiff's status as a priority hire.  (ECF Nos. 182-21, 182-28, 182-11, 182-39-182-44.)

        It is not necessary that Plaintiff prove that the specific actors knew of the protected activity as long as Plaintiff can demonstrate general corporate knowledge.  *See Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir.2011); *see also Trivedi v. N.Y. Unified Court Sys. Office of Court Admin.*, 818 F.Supp.2d 712, 736 (S.D.N.Y.2011) ("A plaintiff need not prove that the specific actors within an organization were aware that the plaintiff made allegations of retaliation to make out a *prima facie* retaliation claim; rather, 'general corporate knowledge that the plaintiff has engaged in a protected activity' is sufficient.")  In this

instance, this court previously determined that plaintiff
adequately pleaded that the City and the FDNY had knowledge of
plaintiff's designation as a "priority hire," (*see* ECF No. 82,
Order at 30), and plaintiff has now presented sufficient
evidence of knowledge, as demonstrated by FDNY documents
identifying plaintiff as a priority hire.  Additionally, the *New
York Post* article cites to FDNY sources who stated, in an
arguably self-serving manner, that they were not retaliating
against Johnson because he was a priority hire, all of which
establishes a disputed issue of fact whether members of the FDNY
had knowledge of Johnson's status.  (Pl. Opp. at 41; *see also*
ECF No. 182-52, Exhibit.)  The record also shows that Curneen
understood plaintiff to be a "priority hire," *inter alia*,
because of his age.  (Pl. 56.1 Stm't. Response to City ¶ 7; ECF
No. 164-3, at 167.)  Plaintiff presented evidence of an email
dated August 4, 2014, to Michael Gala, identifying plaintiff as
a priority hire in the "1/27/14 proby class."  (ECF No. 182-28,
Plaintiff's Exhibit.)  Viewing the evidence in light most
favorable to Plaintiff, the non-moving party, Plaintiff has
established that Defendants had knowledge of plaintiff's
protected activity as a priority hire.

　　　　Defendants Lemonda, Mannix, and Kearney argue that
plaintiff has failed to establish an "adverse action."  (ECF No.
174, Lemonda's Memorandum at 9-10; *see also* ECF No. 178, Mannix

and Kearney's Memorandum at 20.)  Plaintiff, however, contends that there is "evidence to support each of the adverse-action contentions about the treatment Johnson received at the Engine 257 firehouse and the *Post* story."  (Pl. Opp. at 44.)

A materially adverse action is one that "produces an injury or harm" in that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)).  "Trivial harms—*i.e.*, those petty slights or minor annoyances that often take place at work and that all employees experience—are not materially adverse." *Rivera*, 743 F.3d at 25 (internal quotation marks omitted). "Material adversity is to be determined objectively, based on the reactions of a reasonable employee." *Tepperwien v. Entergy Nuclear Operations*, Inc., 663 F.3d 556, 568 (2d Cir. 2011).

Plaintiff has established that he suffered an "adverse action" due to the treatment he endured at Engine 257.  Indeed, plaintiff told Dr. Kelly, the Chief FDNY Medical Officer, that he did not think the treatment he received was because of his race, because he was reluctant to accuse anyone of racism at that time due to fear that it would lead to more problems of retaliation.  (Pl. 56.1 Stm't. Response to City ¶ 67.)  The City

Defendants mistakenly argue that "none of [the] alleged retaliatory acts find factual support in the record," (ECF No. 168, City Defendants' Memorandum at 7), but this is incorrect. First, plaintiff argues that upon his arrival as a "priority hire" at Engine 257, his daily drills to don his equipment were "unnecessary, and a reasonable jury could easily find that having to publicly practice putting on your pants and gear was humiliating." (Pl. Opp. at 56.)  Second, plaintiff also asserts that Curneen's performance evaluations were inconsistent and that when asked about rating Johnson "unsatisfactory," Curneen responded, "that he had no basis for that rating." (*Id.* at 57) (citing ECF No. 164-3, at 173-174.)  Third, Johnson asserted that after the April 2, 2015 fire, he experienced both silent treatment and "berating" by those at Engine 257.  (*Id.* at 57.)

It is also evident that plaintiff suffered an "adverse action" by the FDNY's disclosure to and publication of his personal, confidential information in the *New York Post* article and thereafter.  The Individual Defendants assert that the *Post* article qualifies as a "petty slight or minor annoyance" and cite *to Van Dyke v. Partners of Debevoise & Plimpton LLP,* No. 12 CIV. 8354 GBD RLE, 2013 WL 5375542, at *9 (S.D.N.Y. Sept. 24, 2013). (ECF No. 178, Mannix and Kearney's Memorandum at 19-20.) In their Rule 56.1 statements, the City Defendants and Lemonda emphasize that plaintiff's close relationships with those

outside the FDNY were not negatively impacted following the article and that plaintiff became a tenured firefighter. (Pl. 56.1 Stm't. Response to City ¶¶ 109-126; Response to Lemonda ¶¶ 69-80.) Unlike the plaintiff in *Van Dyke* who claimed retaliation because "someone linked to Debevoise posted comments on an ATL article," which she claims "related to her," (No. 12 CIV. 8354 GBD RLE, 2013 WL 5375542 at 9), Johnson argues that "the *Post* story went viral on the Internet and spawned a full-throated media lynching of Johnson." (Pl. Opp. at 33.)

Additionally, as the court first noted in its March 31, 2018 Order, it is undisputed that the Article cites several unnamed FDNY sources, portrays plaintiff in an extremely negative light, including by referring to him as a 'firefighter in name only,' stating that plaintiff had evaded several fires and that his colleagues had nicknamed him 'Tragic Johnson,' portraying plaintiff to be so inept as to be a safety risk, and generally suggesting that plaintiff is unfit to serve as a firefighter. (ECF No. 82 at 32; ECF No. 182-26, Exhibit; ECF No. 182-29, Exhibit.) As a probationary employee of the FDNY, known as "New York's bravest," plaintiff suffered humiliation sufficient to deter a reasonable person from engaging in protected activity of being hired under programs designed to correct discrimination. Defendants' adverse actions deterred plaintiff's complaints of discriminatory treatment even to the

31

FDNY Medical Officer, as plaintiff testified.  Plaintiff has
therefore established that he suffered an adverse action because
of and following the publication of his personal and
confidential information in the article.

          Defendants next argue "plaintiff also fails to
establish a causal connection between the acceptance of
employment following the Vulcan suit and the disclosure of his
medical leave status, as there is no temporal proximity between
the time of the alleged activity and the article."  (ECF No.
168, City Defendants' Memorandum at 3-4; *see also* ECF No. 174,
Lemonda's Memorandum at 6; ECF No. 179, Mannnix and Kearney
Memorandum at 21-22.)  Plaintiff, however, had returned to duty
as a probationary employee in February 2015, after an extended
medical leave since July 4, 2014, after he sustained a shoulder
injury at a fire.  (Pl. 56.1 Stm't. Response to City ¶¶ 32-38.)
Plaintiff correctly asserts that "the *Post* story [of May 17,
2015] was driven in large part based on the April 2, 2015 fire,
and thus the story was published within a brief period of time
(a month and a half) after the opportunity first arose,"
following plaintiff's return to Engine 257 from medical leave.
(Pl. Opp. at 50.)  Plaintiff cites the FDNY's unlawful
disclosures of plaintiff's personal confidential information in
the *Post* story regarding the April 2, 2015 fire as the
retaliatory act that occurred approximately three months after

32

he resumed his protected activity as a probationary "priority hire."

To establish a "causal connection" in the Second Circuit, a plaintiff must show that his protected activity was a "substantial motivating factor" in the adverse employment decision. *See Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir. 2004) (per curiam) (citation omitted). "This may be done either directly, by evidence of retaliatory animus, or indirectly, by circumstantial evidence, such as by showing that the protected activity was closely followed in time by the adverse employment decision." *Bierce v. Town of Fishkill*, 656 F. App'x 550, 552 (2d Cir. 2016) (summary order).

Defendants contend that there is no evidence in the record to show that they were involved in providing information to the *Post* regarding plaintiff's actions the day of the April 2, 2015 fire, (Pl. 56.1 Stm't. Response to City ¶¶ 101-105; Response to Mannix and Kearney ¶ 97; Response to Lemonda ¶¶ 57-59), thereby evincing no retaliatory animus. Specifically, Lemonda asserts that plaintiff never had a relationship with him and as of September 2009, Lemonda has been on full-time paid "leave" from the FDNY. (Pl. 56.1 Stm't. Response to Lemonda ¶¶ 49, 86.) Plaintiff, however, cites to abundant circumstantial evidence that the defendants leaked the information to the *New York Post* reporter in retaliation for plaintiff's status as a

33

priority hire, including phone records showing calls between
Lemonda, Mannix, and Kearney, and phone records showing calls
between Lemonda and the *New York Post* reporter, and the article
quoting FDNY sources as insiders. (Pl. Opp. at 36, 51-52.)
Further, plaintiff contends that the fact that the reporter
"called Lemonda to talk about Johnson and the April 2nd fire
provides a basis for an inference that Mannix, directly or
indirectly, told Edelman [the reporter] that Lemonda could
provide her with information relevant to the story." (*Id* at
36.)  Plaintiff also cites to phone records that indicate
Lemonda called Kearney on his cell phone after his 31-minute
phone call with the reporter. (*Id*. at 37.)  Plaintiff also
proffers memos and emails between Curneen and Gala, dated April
10, 2015, detailing plaintiff's actions on April 2, and the next
day, (ECF No.182-9, Exhibit), that contain the same confidential
information regarding plaintiff that appeared in the subsequent
*Post* article.  Indeed, the *Post* article states, "shortly after
the [April 2] incident, a chief sent a letter to the Brooklyn
division describing concerns about Johnson, a source said."
(ECF No. 182-26, Exhibit 26.)  Plaintiff also proffers a
multitude of Merit Matters documents, authored by Mannix,
criticizing judicial orders in the Vulcan Class Action, the
judge who presided over the Vulcan Class Action, priority hires
and their abilities, and evidence that Mannix, Kearney, and

34

Gala, were involved with the Organization.  (Pl. Opp. at 14-15
(citing ECF No. 182-34).)

Plaintiff argues that "each individual defendant in
this action (Curneen, Gala, Mannix, Kearney and Lemonda) played
a specific role in the scheme to use the *Post* to execute a hit
job on another minority beneficiary of the Class Action."  (*Id.*
at 34.)  Additionally, plaintiff contends that "the City of New
York did nothing to protect Johnson."  (*Id.*)  Plaintiff further
asserts that on Saturday, May 16th, the Deputy Commissioner of
External Affairs emailed "top FDNY staff" that the *Post* was
writing a story about Johnson.  (*Id.* at 38.)  Plaintiff cites to
said email which references plaintiff's status as a "priority
hire."  (*see id*; ECF No. 182-58.)  Plaintiff also describes that
on May 16th, plaintiff was also contacted by Curneen who informed
him about the *Post* story and that Curneen stated "he had nothing
to do with it."  (*Id.*)

In this court's March 31, 2018 order, the court
determined that "the complaint's allegations regarding the
Article and the roles of Gala, Curneen, and Lemonda in its
publication, together with the inferences reasonably drawn from
these allegations, suffice to allege a materially adverse and
retaliatory employment action."  (ECF No. 82 at 32-33.)  If, the
jury finds, based on direct and circumstantial evidence, that
the City Defendants, the Individual Defendants, and Lemonda

contributed to the disclosure of plaintiff's confidential
information that appeared in the *Post* article, a jury could also
find that they acted in retaliation against plaintiff because he
was a priority hire.  One who assisted in the release of
plaintiff's information and the publication of the Article would
be an aider and abettor of the retaliatory conduct.  Viewing the
evidence, both circumstantial and direct, in the light most
favorable to the non-moving plaintiff, a reasonable jury could
find that defendants subjected plaintiff to humiliating
treatment and improperly disclosed plaintiff's confidential
medical and personal information in retaliation for plaintiff's
status as a priority hire.

        Defendants also argue that there was "no temporal
proximity between the time of the alleged protected activity and
the article" and cite to cases in the Second Circuit that
support the notion that "a passage of more than two months
between the protected activity and the adverse employment action
does not allow for an inference of causation."  (ECF No. 168,
City Defendants' Memorandum at 4; *see also* ECF No. 174,
Lemonda's Memorandum at 18; *see also* ECF No. 178, Mannix and
Kearney's Memorandum at 21-22.)  This court disagrees with
defendants' characterization plaintiff's failure to show
temporal proximity between the protected activity and the
adverse action.  During the course of his assignment at Engine

257, as a "priority hire," plaintiff avers that he was singled out to perform drills to put on his PPE in front of other firefighters at the start of every shift, that his dietary restrictions were not accommodated, that his suspenders were tampered with and tangled with his boots, causing him to miss responding to an alarm on April 3, 2015, that his confidential medical and personnel information, and re-training was leaked to the *New York Post* reporter who cited several unnamed FDNY sources and insiders, all of which occurred soon after he returned to Engine 257 in February 2015.

Because plaintiff has provided sufficient evidence to establish a *prima facie* case of retaliation, defendants must article a legitimate, nondiscriminatory basis for its action. *See Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004); *see also Coffey v. Dobbs Int'l Servs., Inc.*, 170 F.3d 323, 326 (2d Cir.1999) (stating that burden-shifting applies to retaliation claims under Title VII.)  Defendants have failed to do so. Instead, only the City defendants hypothesize that someone could have retaliated against the plaintiff because of his "performance as a firefighter" or that the *Post*'s source "may have just disliked the plaintiff personally."   (ECF No. 168, City Defendants' Memorandum at 14.)

Accordingly, the defendants' motion for summary judgment as to the plaintiff's Title VII retaliation claims are

37

denied.  Because Title VII and the NYSHRL are evaluated under
the same standard, defendants' motions for summary judgment on
the plaintiff's NYSHRL claims are also denied for the reasons
provided above.  *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d
1170, 1177 (2d Cir. 1996) ("We consider [the plaintiff's] state
law claims in tandem with her Title VII claims because New York
courts rely on federal law when determining claims under the New
York [State] Human Rights Law.")

        "To prevail on a retaliation claim under the NYCHRL,
the plaintiff must show that [he] took an action opposing [his]
employer's discrimination and that, as a result, the employer
engaged in conduct that was reasonably likely to deter a person
from engaging in such action."  *Mihalik v. Credit Agricole
Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).
Despite the more lenient standard, a plaintiff must still
establish, however, that "there was a causal connection between
his protected activity and the employer's subsequent action, and
must show that a defendant's legitimate reason for his
termination was pretextual or 'motivated at least in part by an
impermissible motive.'"  *Brightman v. Prison Health Serv., Inc.*,
108 A.D.3d 739, 970 N.Y.S.2d 789, 792 (2013)); *see also Wilcox
v. Cornell Univ.*, 986 F.Supp.2d 281, 287, 2013 WL 6027922, at 4
(S.D.N.Y. Nov. 14, 2013) ("[U]nder all three statutes, Plaintiff
must demonstrate some evidence that 'link[s] her complained-of

[treatment] to a retaliatory motivation.'"  Because plaintiff
has presented evidence to establish a *prima facie* retaliation
case, and in turn, a causal connection between the protected
activity and the subsequent action, defendant's motion for
summary judgment with respect to plaintiff's NYCHRL also fails.

Therefore, the City Defendants' motions for summary
judgment as to the Title VII, NYSHRL, and NYCHRL are denied.
Lemonda and the Individual Defendants' motions for summary
judgment as to the NYSHRL and NYCHRL are also denied because a
reasonable jury could find that they either participated in, or
aided and abetted in the retaliatory actions.

> **C. Retaliatory Hostile Work Environment Claim under Title
> VII, State Law, and Local Law against the City
> Defendants**

Plaintiff also alleges a claim of retaliatory hostile
work environment against the City Defendants in violation of
Title VII, the NYSHRL, and the NYCHRL, claiming that the City
Defendants subjected him to a hostile work environment in
retaliation for being a "priority hire."  (*See* Pl. Opp at 7)
("The retaliation began immediately upon his appointment at
Engine 257 as a 'priority hire' Firefighter pursuant to the
federal court's mandate. And it never really stopped.
Humiliating drills about putting on his pants, bogus performance
evaluations, and a forced psychiatric evaluation were some of
the indignities that Johnson suffered on the job.")

39

"To establish a claim for retaliatory hostile work environment, 'a plaintiff must satisfy the same standard that is applied generally to hostile work environment claims regarding the severity of the alleged conduct.'" *Bacchus v. New York City Dep't of Educ.*, 137 F. Supp. 3d 214, 244 (E.D.N.Y. 2015) (quoting *Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 438 (E.D.N.Y. 2009)); *accord Liang*, 911 F. Supp. 2d at 210 (collecting cases). "The test for 'hostile work environment' has both an objective and a subjective component: 'A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it.'" *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir. 2004) (quoting *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)). "Where there is no direct evidence of such animus, proof of causation may be shown indirectly, by demonstrating that the protected activity was followed closely by a retaliatory action." *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir.2001).

To establish a causal connection between the protected activity and alleged retaliatory hostility, "some increase in the discrimination or harassment-either a 'ratcheting up' of the preexisting behavior, or new, additional forms of harassment-must occur for the employee to make out a viable retaliation claim." *Hall v. Parker Hannifan Corp.*, No. 08-CV-6033, 2009

U.S. Dist. LEXIS 108663, at *15 (W.D.N.Y. Nov. 20, 2009) (citation omitted); *see also Gregory v. Daly*, 243 F.3d 687, 690 (2d Cir. 2001) (holding that plaintiff adequately stated a retaliation claim based on her allegation that her supervisor's conduct significantly worsened after she complained about his sexual harassment and filed a lawsuit against him in state court).  If, however, "the discrimination was just as bad before the employee complained as it was afterwards, then the employee's complaints cannot be said to have led to that discriminatory behavior."  *See Hall*, 2009 U.S. Dist. LEXIS 108663, at *15.

Plaintiff disputes that the drills imposed by Curneen were justified and argues that his daily drills were "unnecessary, and a reasonable jury could easily find that having to publicly practice putting on your pants and gear was humiliating." (Pl. Opp. at 56.)  Plaintiff also asserts that Curneen's performance evaluations were inconsistent and that when asked about rating Johnson "unsatisfactory," Curneen responded, "that he had no basis for that rating." (*Id*. at 57) (citing ECF No. 164-3, at 173-174.)  Johnson also alleges that he experienced both silent treatment and "berating" by those at Engine 257 after the April 2, 2015 fire. (*Id*. at 57.)  Plaintiff also believed "his work environment was hostile and abusive," (*Id*. at 58), and cites to his conversation with Dr.

41

Kelly where he detailed wanting to be transferred and being
screamed at by the other firefighters "for no reason at all."
(ECF No. 167-16, Exhibit P at 11-12.)  The City Defendants,
however, dispute plaintiff's contentions and argue that
"[b]ecause plaintiff never once complained nor requested a
transfer, he cannot credibly establish that he subjectively
perceived his environment to be abusive, and, therefore, City
Defendants are entitled to summary judgment."  (ECF No. 168,
City Defendants' Memorandum at 13.)  Plaintiff has proffered
reasons for being fearful of complaining about his treatment by
defendants.  This court disagrees with the City Defendants that
credibility determinations regarding plaintiff's subjective
perceptions of an abusive and hostile work environment are
appropriate for summary judgment.  Instead, a jury must
determine the credibility of all witnesses at trial.

A reasonable jury could conclude that it was not
necessary, and thus retaliatory, for plaintiff to perform drills
before and after every tour, while other probationary officers
did not have to perform drills with such frequency, and that the
demand for drills in front of other firefighters created a
hostile, humiliating work environment by Captain Curneen.  (*See*
Pl. 56.1 Stm't. Response to City ¶¶ 13-14;) *see also Kennedy v.
New York*, 167 F. Supp. 3d 451, 461 (W.D.N.Y. 2016)("[W]hen the
incidents are extremely frequent, particularly over such a short

42

period of time, it is reasonable to infer that work conditions were 'altered for the worse.'") Plaintiff asserts that "publicly practicing putting on your pants and gear was humiliating." (Pl. Opp. at 56;) *see also Schmitt v. City of New York*, No. 15-CV-05992, 2018 WL 5777019, at *5 (E.D.N.Y. Nov. 1, 2018) ("District Courts in this Circuit have held that a jury could conclude that a supervisor's comments made in front of plaintiff's colleagues, and ranged from tasteless to cruel and humiliating, created a hostile work environment.") Plaintiff further cites to Curneen's acknowledgment that ordering plaintiff to continuously practice his drills was "embarrassing." (Pl. Opp. at 56; ECF No. 164-3, 91-92.)

When viewed in totality, the evidence is sufficient to satisfy plaintiff's minimal burden to establish a *prima facie* retaliatory hostile work environment claim. As noted above, Defendants have failed to articulate a "legitimate, nondiscriminatory basis" for the retaliatory hostile work environment. Thus, the City Defendants' motion for summary judgment as to plaintiff's Title VII, NYSHRL, and NYCHRL is denied as to the retaliatory hostile work environment claim.

## II.   Federal Civil Rights Claims

### A. Individual Liability under Section 1983

Plaintiff alleges that Gala, Curneen, Lemonda, Kearney, and Mannix, acting under color of state law, retaliated

43

against plaintiff because of his status as a priority hire, and violated Section 1983. (*See generally* Pl. Opp.) "Individuals may be held liable under §§ 1981 and 1983 for certain types of discriminatory acts, including those giving rise to a hostile work environment." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004); *see also Hayut v. State University of New York*, 352 F.3d 733, 753–54 (2d Cir.2003). "Section 1983 liability can be imposed upon individual employers, or responsible supervisors, for failing properly to investigate and address allegations . . . when through this failure, the conduct becomes an accepted custom or practice of the employer." *Gierlinger v. New York State Police*, 15 F.3d at 34 (2d Cir. 1994). Having established a retaliatory hostile work environment perpetuated by Curneen and Gala, and further contributed to by evidence that Lemonda and the Individual Defendants leaked of plaintiff's confidential medical and personal information in retaliation for plaintiff's status as a priority hire, this court denies summary judgment as to plaintiff's Section 1983 claim against all defendants.

### B. Individual Liability under Section 1981

Plaintiff appears to allege that Lemonda, Mannix, and Kearney, acting in their individual capacities, violated Section 1981. (*See generally* Pl. Opp.) Lemonda, Mannix, and Kearney all seek summary judgment on plaintiff's Section 1981 claim. Mannix

and Kearney argue that "plaintiff cannot demonstrate that
Defendants possessed discriminatory intent" and that plaintiff
"relies on a series of inferences to impute necessary awareness of
plaintiff's racial minority status."  (ECF No. 179, Mannix and
Kearney Memorandum at 16-17.)

          Pursuant to Section 1981, "a plaintiff must
demonstrate some affirmative link to causally connect the actor
with the discriminatory action.... [P]ersonal liability
under section 1981 must be predicated on the actor's personal
involvement."  *Whidbee v. Garzarelli Food Specialties, Inc.,* 223
F.3d at 75 (internal quotation marks omitted).  As this court
detailed above, a jury may rely on circumstantial evidence to
find that defendants, Lemonda, Mannix, and Kearney provided
information to the *New York Post*.  Viewing the evidence and
drawing inferences in the light most favorable to the non-moving
plaintiff, as the court must in deciding a summary judgment
motion, a reasonable jury could find that defendants leaked
plaintiff's confidential, private information and negative
information about plaintiff to the *Post* because of their
hostility to the plaintiff's status as a priority hire.  The
matter of whether the leak was contributed to by these three
defendants remains as a question of fact for the jury as
factfinder.

"Where, as here, a plaintiff's Title VII and equal protection claims are predicated on the same allegations they 'must stand or fall together.'" *Arroyo-Horne v. City of New York*, No. 07-CV-5213, 2011 U.S. Dist. LEXIS 23904, at *29 (E.D.N.Y. Mar. 9, 2011) (quoting *Feingold*, 366 F.3d at 159); *see also Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) ("The substantive standards applicable to claims of employment discrimination under Title VII . . . are also generally applicable to claims of employment discrimination brought under §1981, the Equal Protection Clause, and the NYSHRL."). Therefore, the summary judgment motions by Lemonda, Mannix, and Kearney as to plaintiff's Section 1981 claim are denied.

### C. Section 1983 Claim for Municipal Liability against the City of New York

Plaintiff asserts a claim for municipal liability against the City of New York under Section 1983, based on alleged violations of the Thirteenth and Fourteenth Amendments. In this court's March 31, 2018 Order, the court granted plaintiff leave to amend his complaint to assert a claim against the City Defendants "under section 1983 asserting that they 'depriv[ed] [plaintiff] of [the] rights, privileges, or immunities secured by the Constitution and laws' of the United States, specifically those rights guaranteed by section 1981." (ECF No. 82, Order at 54.) This court also made clear that in

order to enforce the rights guaranteed by Section 1983,
plaintiff must "allege the existence of municipal liability
under *Monell v. Department of Social Services*, 436 U.S. 658
(1978), and its progeny."  (*Id.*)

Municipal entities may be held liable under § 1983
where a plaintiff demonstrates that the constitutional violation
complained of was caused by a municipal "policy or custom."
*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Patterson
v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004).  "To show
a policy, custom, or practice, the plaintiff need not identify
an express rule or regulation."  *Patterson*, 375 F.3d at 226
(citing *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d
Cir. 1992)).  The policy may be inferred based on the fact that
a practice is so persistent or widespread as to constitute
custom or usage with force of law, or that the discriminatory
practice of subordinate employees was so manifest as to imply
constructive acquiescence of senior policymaking officials.  *Id.*
(citing *Sorlucco*, 971 F.2d at 870-71).  A policy may also be
inferred where "'the municipality so failed to train its
employees as to display a deliberate indifference to the
constitutional rights of those within its jurisdiction.'"  *Id.*
(quoting *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir.
1996), *cert. denied*, 520 U.S. 1155 (1997)).  "[D]eliberate
indifference is a stringent standard of fault, and necessarily

depends on a careful assessment of the facts at issue in a particular case." *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011).

In order to show that the municipality's failure to train and supervise constituted "deliberate indifference, the plaintiff must show "[ (1) ] that [the] policymaker knows to a moral certainty that her employees will confront a given situation ... [,][ (2) ] that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation ... [,] [and] [ (3) ] that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *See Cowan v. City of Mount Vernon*, 95 F.Supp.3d 624, 638 (S.D.N.Y. 2015) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007).

The City contends that there was a training program in place; therefore, plaintiff also bears the burden of "identify[ing] a specific deficiency in the [C]ity's training program and establish[ing] that the deficiency is closely related to the ultimate injury such that it actually caused the constitutional deprivation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (citing *City of Canton*, 489 U.S. at 391, 109 S.Ct. 1197).

48

The City Defendant further argues that the plaintiff
cannot establish *Monell* liability.  (ECF No. 168, City
Defendants' Memorandum at 20.)  Specifically, the City Defendant
asserts that "at all relevant times the FDNY maintained
comprehensive anti-discrimination and anti-retaliation
policies."  (*Id.*)  Plaintiff, in turn, argues that the City
engaged in "lax investigations" of violations of its anti-
discrimination policies which led to "wrongdoing" and a creation
of "a *de facto* policy of non-supervision."  (Pl. Opp. at 73.)
Plaintiff also states that the BIT's investigation into the
undisputed FDNY leaks of personal, confidential, and derogatory
information regarding plaintiff to the *Post* was not thorough.
(*Id.* at 75.)  Specifically, Johnson notes that the investigation
did not seek phone records which would show communication
between Kearney, Mannix, and Lemonda on or about the day that
Lemonda spoke with the *Post* reporter.  (*Id.* at 74.)  Plaintiff
also details Mannix's ongoing hostility to priority hires and
his involvement in leaking information to the *Post* about
priority hires, (*Id.* at 74-75), and the lack of meaningful
discipline of Mannix by the FDNY.  (*Id.* at 75.)  Specifically,
prior FDNY leaks to the *Post* included information on four other
priority hire firefighters, and a lack of thorough FDNY BIT
investigations to promptly identify, discipline, and deter the
leakers within the FDNY, including Chief Mannix, who had been

49

investigated and ultimately disciplined for leaks to the *Post* prior to the *Post* article regarding plaintiff.  (*Id.* at 73-76.)

Plaintiff asserts that the lack of meaningful investigation and discipline was a policy by the City of New York.  "[T]he word "policy" generally implies a course of action consciously chosen from among various alternatives."  *Vives v. City of New York*, 524 F.3d 346, 350 (2d Cir. 2008) (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).  The City has asserted the existence of its anti-discrimination and anti-retaliation policies, but has not provided evidence of how these policies were maintained and carried out by senior FDNY officials.  For instance, in the City's responses to plaintiff's interrogatories, the City vaguely asserts that "the FDNY revamped its EEO [Equal Employment Opportunity] policy to provide greater clarity and guidance regarding the prohibition against retaliation," but does not state what those enhancements entailed or how they were implemented.  (ECF No. 182-24, Exhibit at 4.)  There is no evidence in the record regarding enhancements that purportedly were made to the FDNY's training.  Instead, the City broadly asserts that the changes to the training program "placed greater emphasis and included interactive exercises on retaliation."  (*Id.*)

Plaintiff has offered sufficient evidence of deliberate indifference to the ongoing discrimination and

retaliation against priority hires by the FDNY.  The City was on notice of discrimination and retaliation claims by priority hires following the Vulcan Class Action lawsuit.  *See United States v. City of New York*, 905 F. Supp. 2d 438, 449-50 (E.D.N.Y. 2012).  Moreover, even though the City was aware of Mannix's involvement in leaking information to the *New York Post* about other priority hires, Mannix was not disciplined until after the article about plaintiff was published in the *Post*. (Pl. Opp. at 74.)  Mannix himself acknowledged that he was aware of the FDNY's requirement that he must keep official information confidential, but he did not think that regulation was "enforced," nor was it specific."  (Pl. Opp. at 76) (citing ECF No. 170-9, Exhibit at 190-192.)  Thus, based on the foregoing, a reasonable jury could infer deliberate indifference by the City. *See Vann v. City of N.Y.*, 72 F.3d 1040, 1049 (2d Cir.1995) (holding that deliberate indifference may be inferred if repeated complaints of civil rights violations are "followed by no meaningful attempt to investigate or forestall further incidents.")  A reasonable jury could infer deliberate indifference because the City took minimal ineffective steps to thoroughly investigate wrongdoings by the FDNY against priority hires.  The City's motion for summary judgment on the municipal liability claim is therefore denied.

### D. Section 1985(c) and Section 1983 Conspiracy Claims

Plaintiff contends that each individual defendant, Curneen, Gala, Mannix, Kearney, and Lemonda "played a key role in the conspiracy's objective – to leak false, damaging and inflammatory information about Johnson in furtherance of their agenda of attacking the Class Action, the remedial orders, and the priority hires who participate in the Class Action." (Pl. Opp. at 79.)

Plaintiff's conspiracy claim must fail as a matter of law. "Where the individual defendants are all employees of the institutional defendant, a claim of conspiracy will not stand." *Burrell v. City University of New York*, 995 F.Supp. 398, 414 (S.D.N.Y.1998) (citing *Everston v. State of New York Mortgage Agency*, 89 Civ. 7474, 1992 WL 6190, at *6 (S.D.N.Y. Jan. 3, 1992); *see also Ritzie v. City Univ. of New York*, 703 F.Supp. 271, 277–78 (S.D.N.Y.1989) (dismissing a conspiracy claim when individual defendants were all employees of institutional defendant university). Here, the alleged conspirators were all members of the FDNY at the time of the alleged conspiracy. (*See* Pl. 56.1 Stm't. Response to Mannix and Kearney ¶¶ 3-5.) Thus, this court grants all defendants' motions for summary judgment as to plaintiff's Sections 1985(c) and 1983 conspiracy claims.

## CONCLUSION

For the reasons set forth above, the defendants' motions for summary judgment are granted in part and denied in part.  Specifically,

(1)  The City Defendants' motion for summary judgment as to the Title VII, NYSHRL, and NYCHRL retaliation claims are DENIED.

(2)  Curneen, Gala, Lemonda and the Individual Defendants' motions for summary judgment as to plaintiff's NYSHRL and NYCHRL claims are DENIED.

(3)  The City Defendants' motion for summary judgment as to plaintiff's retaliatory hostile work environment claim is DENIED.

(4)  Curneen, Gala, Lemonda, Kearney and Mannix's motions pursuant to Section 1983 are DENIED.

(5)  Lemonda and the Individual Defendants' motions for summary judgment as to plaintiff's section 1981 claim against them are DENIED.

(6)  The City Defendant's motion for summary judgement pursuant to section 1983, alleging municipal liability is DENIED.

(7)  All of the defendants' motions for summary judgment as to plaintiff's Sections 1985 and 1983 conspiracy claims are GRANTED.

The parties are directed to confer and jointly advise the court via ECF as to how they intend to proceed by Friday, April 9, 2021.  The parties are also urged to re-engage in settlement discussions and seek the assistance of Magistrate Judge Vera M. Scanlon in any settlement efforts. **SO ORDERED.**


Dated:     March 30, 2021
           Brooklyn, New York

                          _____/s/_____
                          Hon. Kiyo A. Matsumoto
                          United States District Judge